STATE of Wisconsin, Plaintiff-Respondent,

v.

Mark D. JENSEN, Defendant-Appellant.†

Court of Appeals

*No. 2009AP898–CR. Submitted on briefs June 4, 2010.
—Decided December 29, 2010.*

2011 WI App 3

(Also reported in 794 N.W.2d 482.)

† Petition For Review Filed.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Christopher W. Rose* and *Terry W. Rose* of *Rose & Rose, Kenosha*, and *Michael D. Cicchini* of *Cicchini Law Office, LLC*, Kenosha.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Marguerite M. Moeller*, assistant attorney general, and *J.B. Van Hollen*, attorney general.

Before Brown, C.J., Neubauer, P.J., and Anderson, J.

¶ 1. ANDERSON, J. Mark D. Jensen appeals from a judgment of conviction for the first-degree intentional

447

homicide of his wife Julie Jensen. Jensen presents many arguments on appeal, none of which persuade. We affirm.

## Background

¶ 2. Paragraphs three through thirteen of this opinion relate pertinent background facts laid out by our supreme court in *State v. Jensen*, 2007 WI 26, 299 Wis. 2d 267, 727 N.W.2d 518. We will recite additional facts as they become relevant to our discussion of the appellate issues.

¶ 3. A criminal complaint charging Jensen with first-degree intentional homicide in the December 3, 1998 poisoning death of his wife Julie was filed in Kenosha county on March 19, 2002. *Id.*, ¶ 3.

¶ 4. At Jensen's preliminary hearing conducted in spring 2002, the State presented testimony from several witnesses, including Julie's neighbor, Tadeusz Wojt, Officer Ron Kosman, and Detective Paul Ratzburg. *Id.*, ¶ 4.

¶ 5. Wojt testified that just prior to Julie's death, she gave him an envelope and told him that if anything happened to her, Wojt should give the envelope to the police. *Id.*, ¶ 5. Wojt also stated that during the three weeks prior to Julie's death, she was upset and scared, and she feared that Jensen was trying to poison her or inject her with something because Jensen was trying to get her to drink wine and she found syringes in a drawer. *Id.*, ¶ 5. Julie also allegedly told him that she did not think she would make it through one particular weekend because she had found suspicious notes written by her husband and computer pages about poisoning. *Id.*

¶ 6. Kosman testified that he received two voicemails approximately two weeks prior to Julie's death.

*Id.*, ¶ 6. Julie told Kosman in the second voicemail that she thought Jensen was trying to kill her, and she asked him to call her back. *Id.* Kosman returned Julie's call and subsequently went to her home to talk with her. *Id.* Julie told Kosman that she saw strange writings on Jensen's day planner, and she said Jensen was looking at strange material on the Internet.[1] *Id.* Julie also informed Kosman that she had photographed part of Jensen's day planner and had given the pictures, along with a letter, to a neighbor (Wojt). *Id.* Julie then retrieved at least one picture, but not the letter from the neighbor, and gave it to Kosman, telling him if she were found dead, that she did not commit suicide, and Jensen was her first suspect. *Id.* Kosman also testified that in August or September 1998, Julie told him it had become very "cold" in their home and that Jensen was not as affectionate as he used to be. *Id.* Kosman stated that Julie said that when Jensen came home from work, he would immediately go to the computer. *Id.*

¶ 7. Ratzburg testified that on the day after Julie's death, he received a sealed envelope from Wojt. *Id.*, ¶ 7. The envelope contained a handwritten letter,[2] addressed to "Pleasant Prairie Police Department, Ron

---

[1] "After Julie's death, police seized the computer in the Jensen[s'] home and found that on various dates between October 15 and December 2, 2002, several websites related to poisoning were visited; including one entitled 'Ethylene Glycol.' " *State v. Jensen*, 2007 WI 26, ¶ 6 n.1, 299 Wis. 2d 267, 727 N.W.2d 518. (Because Julie died on December 3, 1998, we believe the court meant to refer to the three-month time period leading up to Julie's death, October 15 to December 2, 1998, not 2002.)

[2] After comparing the letter to known writing samples from Julie, a document examiner with the state crime lab concluded that the letter was written by Julie. *Jensen*, 299 Wis. 2d 267, ¶ 7.

Kosman or Detective Ratzburg"; it bore Julie's signature that read as follows:

> I took this picture [and] am writing this on Saturday 11–21–98 at 7AM. This "list" was in my husband's business daily planner—not meant for me to see, I don't know what it means, but if anything happens to me, he would be my first suspect. Our relationship has deteriorated to the polite superficial. I know he's never forgiven me for the brief affair I had with that creep seven years ago. Mark lives for work [and] the kids; he's an avid surfer of the Internet . . . .
>
> Anyway—I do not smoke or drink. My mother was an alcoholic, so I limit my drinking to one or two a week. Mark wants me to drink more—with him in the evenings. I don't. I would never take my life because of my kids—they are everything to me! I regularly take Tylenol [and] multi-vitamins; occasionally take OTC stuff for colds, Zantac, or Immodium; have one prescription for migraine tablets, which Mark use[s] more than I.
>
> I pray I'm wrong [and] nothing happens . . . but I am suspicious of Mark's suspicious behaviors [and] fear for my early demise. However, I will not leave David [and] Douglas. My life's greatest love, accomplishment and wish: "My 3 D's"—Daddy (Mark), David [and] Douglas.

*Id.*

¶ 8. Following the preliminary hearing, Jensen was bound over for trial, and an information charging Jensen with first-degree intentional homicide was filed. *Id.*, ¶ 8. Jensen subsequently entered a plea of not guilty at his arraignment on June 19, 2002. *Id.*

¶ 9. Among the pretrial motions Jensen filed were motions challenging the admissibility of the letter received by Ratzburg and the oral statements Julie allegedly made to Wojt and Kosman. *Id.*, ¶ 9. Jensen also

challenged the admissibility of oral statements Julie purportedly made to her physician, Dr. Richard Borman, and her son's teacher, Therese DeFazio. *Id.* These motions were extensively briefed and argued before the court. *Id.* The circuit court evaluated each of Julie's disputed statements independently to determine its admissibility under the hearsay rules and the then-governing test of *Ohio v. Roberts*, 448 U.S. 56 (1980). *Jensen*, 299 Wis. 2d 267, ¶ 9. The circuit court ruled that most, but not all, of the statements were admissible. *Id.* Julie's in-person statements to Kosman and Julie's letter were admitted in their entirety. *Id.* The State conceded the voicemails to Kosman were inadmissible hearsay. *Id.*

¶ 10. On May 24, 2004, Jensen moved for reconsideration on the admissibility of Julie's statements in light of the United States Supreme Court's ruling in *Crawford v. Washington*, 541 U.S. 36 (2004), that the Sixth Amendment's Confrontation Clause bars admission against a criminal defendant of an uncross-examined "testimonial" statement that an unavailable witness previously made out of court. *See Jensen*, 299 Wis. 2d 267, ¶ 10. After a hearing on the motion, the circuit court orally announced its decision on June 7, 2004, and concluded that Julie's letter and voicemails were testimonial and therefore inadmissible under *Crawford. Jensen*, 299 Wis. 2d 267, ¶ 10. The circuit court rejected the State's argument that the statements were admissible under the doctrine of forfeiture by wrongdoing.[3] *Id.* The circuit court also determined that Julie's statements to Wojt and DeFazio were nontesti-

---

[3] The forfeiture by wrongdoing doctrine was codified in 1997 in the Federal Rules of Evidence as a hearsay exception. *See* Fed. R. Evid. 804(b)(6); *see also Jensen*, 299 Wis. 2d 267, ¶ 43. This rule reads as follows:

monial and, therefore, the statements were not excluded. *Id.* On August 4, 2004, the circuit court issued a written order memorializing its oral rulings. *Id.*

¶ 11. The State appealed the circuit court's ruling with respect to Julie's letter and her voicemail message to Kosman.[4] *Id.*, ¶ 11. Jensen subsequently cross-appealed the ruling that the statements of Wojt and DeFazio were not excluded. *Id.* After the State and Jensen had filed opening briefs in the court of appeals, the State filed a petition to bypass, which Jensen did not oppose. *Id.* Our supreme court granted the petition. *Id.*

¶ 12. Reduced to their essence, the appeal and cross-appeal before the supreme court concerned the circuit court's determinations on the testimonial or nontestimonial nature of various statements of Julie's that the State sought to introduce. *Id.* The supreme court affirmed the order of the circuit court as to its initial rulings on the admissibility of the various statements under *Crawford. Jensen*, 299 Wis. 2d 267, ¶ 2. It

---

Rule 804. Hearsay Exceptions; Declarant Unavailable

. . . .

(b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . . .

(6) Forfeiture by wrongdoing. A statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the decedent as a witness.

Fed. R. Evid. 804(b)(6).

[4] The district attorney conceded that the statements Julie made to Kosman during a conversation on November 24, 1998, were testimonial. *Jensen*, 299 Wis. 2d 267, ¶ 11 n.4. With respect to these statements, the State argued only that they are admissible under the forfeiture by wrongdoing doctrine. *Id.*

held that the statements Julie made to Kosman, including the letter, are "testimonial," while the statements Julie made to Wojt and DeFazio are "nontestimonial." *Id.*

¶ 13. However, it reversed the circuit court's decision as to the applicability of the forfeiture by wrongdoing doctrine to Julie's testimonial statements. *Id.* In so doing, the supreme court "explicitly" adopted a broad forfeiture by wrongdoing doctrine "whereby a defendant is deemed to have lost the right to object on confrontation grounds to the admissibility of out-of-court statements of a declarant whose unavailability the defendant has caused." *Id.*, ¶ 2; *see also id.*, ¶ 57. It concluded that if the State can prove by a preponderance of the evidence that the accused caused the absence of the witness, the forfeiture by wrongdoing doctrine will apply to the confrontation rights of the defendant. *Id.*, ¶¶ 2, 57. As such, it remanded the case to the circuit court "for a determination of whether, by a preponderance of the evidence, Jensen caused Julie's unavailability, thereby forfeiting his right to confrontation." *Id.*, ¶ 2.

### Remand

¶ 14. On remand, a ten-day forfeiture by wrongdoing hearing ensued. For its decision, the circuit court followed the supreme court's mandate to make a determination of whether, by a preponderance of the evidence, Jensen caused Julie's unavailability. *See id.*, ¶¶ 2, 57. Ultimately, the circuit court admitted the disputed evidence, relying on its finding by a preponderance of the evidence that Jensen had caused Julie's absence from the trial and thus forfeited his right to confront the testimonial statements attributed to Julie.

¶ 15. During the forfeiture hearing, the State also introduced other acts evidence which it offered to demonstrate the existence of motive. At trial, various objections were made to the allegedly improper other acts evidence and ruled on by the circuit court.

¶ 16. The circuit court also conducted hearings on other motions, including Jensen's motion to suppress the search evidence from his home. The central issue was whether the consent form signed by Jensen provided authority for police to search and seize Jensen's computer and hard drive. Detective Paul Ratzburg testified that on December 3, 1998, he was dispatched to the Jensen home because Julie had been found dead. Ratzburg said that he asked Jensen if he knew of any information on why Julie died and that Jensen indicated he was unsure but thought it had something to do with an allergic reaction to medications. Ratzburg stated Jensen indicated that he had been up earlier that evening or the day before looking up that information on the internet.

¶ 17. Ratzburg also testified that he showed Jensen a Consent to Search and Seizure document and informed Jensen that he wanted to investigate the potential cause of Julie's death and whether it was connected to the previously reported incidents by Jensen and Julie that they thought they had prowlers leaving pornographic photographs in and around the Jensen home. He said he told Jensen that because of their investigation, Jensen would have to find somewhere else to spend the night. Jensen said that would be no problem, he would stay with his dad. Jensen read and signed the consent document. The document, State's Exhibit 1, included Jensen's authorization for the police to conduct "a complete search of my premise, automobile, and/or person." And further included: "I,

Mark Jensen, fully realize my right to refuse to consent to this said search and seizure. I do hereby authorize the said police officers to take from my premise, automobile and/or person any letters, writings, paper, materials or other property which they may desire."

¶ 18. After hearing the evidence on the motion to suppress, the court denied it, finding that it would be "quite apparent to a reasonable person that the search was going to be a very thorough one" and that a reasonable person would conclude:

> [A]t a minimum the police would turn the computer on and review historical information contained on it or otherwise examine its contents, again, particularly since [Jensen] himself had told the police that he had used it the previous day to access sites dealing with drug reactions which would be relevant to this case.

¶ 19. After the many days of motion hearings concluded, the over thirty-day jury trial began on January 3, 2008, and concluded on February 21, 2008. A judgment of conviction finding Jensen guilty of first-degree intentional homicide was entered on February 27, 2008. Given the enormity of the record, and in the interest of judicial economy, we include further facts and evidence presented at trial in our discussion.

## Discussion

¶ 20. Four months after Jensen's conviction, in June 2008, the United States Supreme Court decided *Giles v. California*, 128 S. Ct. 2678 (2008), and clarified the forfeiture by wrongdoing exception to the Confrontation Clause. On April 6, 2009, Jensen filed notice of this appeal. On appeal, Jensen raises multiple challenges to his homicide conviction:

455

1. Did *Giles'* narrow interpretation of the forfeiture by wrongdoing exception to the Confrontation Clause overrule the Wisconsin Supreme Court's broad interpretation in *Jensen* making Julie's letter and statements to Kosman inadmissible pursuant to *Crawford*?

2. Are the admission of Julie's letter and Jensen's statements to Kosman harmless error?

3. Is Julie's letter to police a dying declaration?

4. Are the statements Julie made to Therese DeFazio, Tad and Margaret Wojt, Kosman and Ratzburg, via the letter, inadmissible hearsay which should have been excluded?

5. Was the circuit court biased against Jensen's case?

6. Was prejudicial other acts evidence admitted which should have been excluded from trial?

7. Should the computer evidence seized at Jensen's home have been excluded because the evidence was obtained without a warrant and was beyond the scope of the consent given?

8. Should Jensen's conviction be reversed in the interest of justice?

¶ 21. Several of Jensen's challenges are nonstarters which we address later in this discussion; the rest center on the admissibility of testimonial and nontestimonial evidence as it relates to the Sixth Amendment right of confrontation, to the hearsay rules and to their respective exceptions.

## *Giles*

¶ 22. First, *Giles*. In a much narrower interpretation of the forfeiture by wrongdoing exception to the Confrontation Clause than that espoused by our su-

preme court in *Jensen*, the United States Supreme Court, in *Giles*, held that a defendant forfeits his or her confrontation right only when acting with intent to prevent the witness from testifying; the requirement of intent "means that the exception applies only if the defendant has in mind the particular purpose of making the witness unavailable." *See Giles*, 128 S. Ct. at 2687 (citations omitted). The Supreme Court further clarified that "only testimonial statements are excluded by the Confrontation Clause," but "[s]tatements to friends and neighbors about abuse and intimidation, and statements to physicians in the course of receiving treatment would be excluded, if at all, only by hearsay rules which are free to adopt the dissent's version of forfeiture by wrongdoing." *See id.* at 2692–93.

¶ 23. Put another way then, nontestimonial statements are *not* excluded by the Confrontation Clause and thereby may be analyzed for purposes of a hearsay objection under the version of the forfeiture by wrongdoing doctrine espoused by the *Giles'* dissent, which, like the version espoused by our supreme court in *Jensen*, is very broad. *See Jensen*, 299 Wis. 2d 267, ¶¶ 2, 57. The broad version of the forfeiture by wrongdoing analysis—specifically approved in *Giles* for nontestimonial statements—deems nontestimonial statements admissible if the witness's "unavailability to testify at *any* future trial was a *certain* consequence of the murder. And any reasonable person would have known it." *See Giles*, 128 S. Ct. at 2698 (Breyer, J., dissenting) (citation omitted); *see also id.* at 2692–93, and *Jensen*, 299 Wis. 2d 267, ¶¶ 2, 57.

¶ 24. Jensen asserts that, under the narrow version of the forfeiture by wrongdoing exception espoused by the *Giles'* majority, the admission of the *testimonial*

457

statements is reversible error. He further argues that the admission of the *nontestimonial* statements is reversible error under *State v. Manuel*, 2005 WI 75, ¶ 60, 281 Wis. 2d 554, 697 N.W.2d 811, which held that nontestimonial statements still should be evaluated for Confrontation Clause purposes. *See Jensen*, 299 Wis. 2d 267, ¶ 12 n.5.

■

¶ 25. Mistakenly, while Jensen ardently relies on *Giles'* clarification narrowing the forfeiture by wrongdoing exception, he pays no heed to *Giles'* further clarification that *"only testimonial* statements are excluded by the Confrontation Clause," but "[s]tatements to friends and neighbors about abuse and intimidation, and statements to physicians in the course of receiving treatment would be excluded, if at all, only by hearsay rules, which are free to adopt the dissent's version of forfeiture by wrongdoing." *See Giles*, 128 S. Ct. at 2692–93 (emphasis added).

■

¶ 26. Unlike Jensen, we do pay heed to the entirety of the *Giles'* decision. In so doing, we recognize that *Manuel's* holding that nontestimonial statements should be evaluated for Confrontation Clause purposes is in direct conflict with *Giles'* holding that "only testimonial statements are excluded by the Confrontation Clause." We adhere to the *Giles'* holding because the Supremacy Clause of the United States Constitution compels adherence to United States Supreme Court precedent on matters of federal law, although it means deviating from a conflicting decision of our state supreme court. *See State v. Jennings*, 2002 WI 44, ¶ 3, 252 Wis. 2d 228, 647 N.W.2d 142. Thus, Jensen's reliance on *Manuel*, for his assertion that the nontestimonial statements should have been excluded, fails. The

nontestimonial statements are not excluded by the Confrontation Clause and, for purposes of a hearsay objection, may be analyzed under a broader version of the forfeiture by wrongdoing doctrine, such as that proffered by the dissent in *Giles* and by our supreme court in *Jensen*. *See Giles*, 128 S. Ct. at 2692–93.

## Testimonial/Nontestimonial Statements

¶ 27. In order to determine which statements may be analyzed under the broader version of the forfeiture by wrongdoing analysis, we must first determine which statements are testimonial and which are not. Fortunately, our supreme court has done so for us in *Jensen*, 299 Wis. 2d 267, ¶ 2. *See Livesey v. Copps Corp.*, 90 Wis. 2d 577, 581, 280 N.W.2d 339 (Ct. App. 1979) (recognizing that "[t]he court of appeals is bound by the prior decisions of the Wisconsin Supreme Court"). After explaining that a statement is "testimonial" if a reasonable person in the position of the declarant would objectively foresee that his or her statement might be used in the investigation or prosecution of a crime, the supreme court determined that the statements Julie made to Kosman, including the letter addressed to the police, are "testimonial," while the statements Julie made to her neighbor, Wojt, and her son's teacher, DeFazio, are "nontestimonial." *Jensen*, 299 Wis. 2d 267, ¶¶ 2, 25.

¶ 28. With regard to the nontestimonial evidence, per the Supreme Court's rationale in *Giles*, we may adhere to the broad version of the forfeiture by wrongdoing exception to the general prohibition against hearsay, such as that espoused by our supreme court in *Jensen*. Thus, because the circuit court's finding by a

459

preponderance of the evidence that Jensen caused Julie's absence is not clearly erroneous, we hold that any hearsay objection is overcome.[5]

¶ 29. With regard to the testimonial statements, i.e., hearsay evidence, the Sixth Amendment demands what the common law required: (1) unavailability and (2) a prior opportunity for cross-examination. *See Crawford*, 541 U.S. at 68. The threshold question in examining whether a defendant's right to confrontation is violated by the admission of hearsay evidence is whether that evidence is admissible under the rules of evidence. *State v. Williams*, 2002 WI 118, ¶ 2, 256 Wis. 2d 56, 652 N.W.2d 391. If the evidence does not fit within a recognized hearsay exception, it must be excluded. *Id.*

¶ 30. However, only after it is established that the evidence fits within a recognized hearsay exception or was admitted erroneously does it become necessary to consider confrontation. *Id.* In so doing, it is necessary to bear in mind that a determination of a Confrontation Clause violation does not result in automatic reversal, but rather is subject to harmless error analysis. *Id.* The test for this type of harmless error was set forth in *Chapman v. California*, 386 U.S. 18 (1967). There, the Supreme Court explained that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a

---

[5] We note that Jensen did not substantively challenge the circuit court's finding that the preponderance of the evidence showed that Jensen caused Julie's absence. We deem that challenge abandoned. *See State v. Ledger*, 175 Wis. 2d 116, 135, 499 N.W.2d 198 (Ct. App. 1993) (issues not briefed or argued are deemed abandoned).

460

reasonable doubt." *Id.* at 24; *see also State v. Harvey*, 2002 WI 93, ¶ 48 n.14, 254 Wis. 2d 442, 647 N.W.2d 189 (citing *Neder v. United States*, 527 U.S. 1, 18 (1999)).

¶ 31. Our Wisconsin Supreme Court has articulated several factors to aid in the harmless error analysis; these include the frequency of the error, the importance of the erroneously admitted evidence, the presence or absence of evidence corroborating or contradicting the erroneously admitted evidence, whether the erroneously admitted evidence duplicates untainted evidence, the nature of the defense, the nature of the state's case, and the overall strength of the state's case. *State v. Stuart*, 2005 WI 47, ¶ 41, 279 Wis. 2d 659, 695 N.W.2d 259.

¶ 32. An error is harmless if the beneficiary of the error proves "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.*, ¶ 40 (citing *Chapman*, 386 U.S. at 24). In this appeal, the State carries the burden of proof in this regard. *See, e.g., Stuart*, 279 Wis. 2d 659, ¶ 40.

¶ 33. The State claims that post-*Giles*, "logic" and case law "compel the conclusion that if [the State can prove] one reason Jensen killed Julie was to prevent her testimony in a family court action, then he forfeited the right to confront her at his murder trial." The State argues that if we reject its invitation to adopt a broad interpretation of the post-*Giles* forfeiture by wrongdoing exception, any error in admitting the challenged evidence was harmless beyond a reasonable doubt.

¶ 34. We decline the State's invitation to adopt a broad interpretation of the post-*Giles* forfeiture by wrongdoing exception and leave for another day whether *Giles* should be read to permit testimonial

461

evidence when the state can establish by a preponderance of the evidence that the defendant sought to prevent the victim from testifying in *any* court proceeding.

¶ 35. Instead, we assume that the disputed testimonial evidence was erroneously admitted; however, we deem its admission harmless beyond a reasonable doubt given the voluminous corroborating evidence, the duplicative untainted evidence, the nature of the defense, the nature of the State's case, and the overall strength of the State's case. *See Stuart*, 279 Wis. 2d 659, ¶ 41.

¶ 36. Here, we will not attempt to catalog all the untainted evidence the State presented; however, we will summarize some of the compelling pieces in order to illustrate that the record is replete with reason to uphold the jury's verdict, even if the assumedly tainted evidence is disregarded.

¶ 37. This case was not a classic whodunit. Jensen's counsel told the jury in opening statements that the facts will prove Julie killed herself and tried to frame Jensen for her murder. Thus, any evidence favoring the State's homicide charge or disfavoring Jensen's suicide/framing theory strengthened the State's case. Again, we underscore that the below summary is meant only to be illustrative and does not convey the entirety of the compelling case the State presented to the jury:

> 1. *The computer evidence.* This was probably the most incriminating other evidence. In October 1998, the Jensens' home computer revealed that searches for various means of death coincided with e-mails between Jensen and his then-paramour, Kelly, discussing how they planned to deal with their respective spouses and begin "cleaning up [their] lives" so they could be to-

gether and take a cruise the next year. Jensen was evasive when Kelly asked him how he planned to take care of his "details" and, significantly, Jensen's e-mails did not mention divorce at all. On the same date Jensen was planning a future with Kelly, his home computer revealed Internet searches for botulism, poisoning, pipe bombs and mercury fulminate. A website was visited that explained how to reverse the polarity of a swimming pool—the Jensens had a pool—by switching the wires around, likening the result to the 4th of July. The State pointed out the absence of Internet searches on topics like separation, divorce, child custody or marital property.

Significantly strong was the evidence of the Internet sites visited on the morning of Julie's death. Exhibit 89 reveals a 7:40 a.m. search for "ethylene glycol poisoning." Jensen told Ratzburg that the morning of Julie's death she "could hardly sit up," she "was not able to get out of bed," and she "was not able to move around and function." Jensen said he was propping Julie up in bed at 7:30 a.m., which was ten minutes before the search for ethylene glycol poisoning, and that he did not leave home to take their son to preschool until 8:00 or 9:00 a.m.

Finally, the State presented abundant evidence that Julie rarely used computers and that, in contrast, Jensen was a skilled computer user and avid Internet surfer.

2. *The motive evidence.* Elsewhere in this opinion we elaborate on the motive evidence, but suffice it to say that the State provided evidence that, not only was Jensen having an affair and planning a future with another woman in the months before Julie died, he remained bitter about Julie's affair and engaged in a campaign of emotional torture against Julie.

3. *Jensen's incriminating statements.* The jury also heard from Jensen's coworker and friend, David

463

Nehring, who testified that around November 1998 Jensen was researching possible drug interactions on the Internet several times a day and told Nehring that he was doing it in order to find an explanation for Julie's (allegedly) unusual behavior.

In addition, the jury heard from Edward Klug, a fellow stockbroker, who attended a national sales convention with Jensen November 5–7, 1998. Klug testified that during a late-night gripe session about their spouses, Jensen told him that if one wanted to get rid of his wife, there were websites instructing how to kill her, how to poison her with things that would be undetectable. Klug said that Jensen told him that giving doses of Benadryl and antifreeze "over a long period of time" is "relatively undetectable" and will start "crystallizing you from the inside out." Klug said that this was not a discussion of how to get rid of one's wife in the abstract but rather that Jensen "was telling me that he was going to be doing that."

4. *The medical evidence.* The jury heard medical testimony that Julie suffered from ethylene glycol poisoning and died of asphyxia. Dr. Michael Chambliss, who conducted the autopsy, testified that he believed the cause of death to be "asphyxia by smothering." Dr. Mary Mainland, a medical examiner for Kenosha county, concluded that Julie had received multiple doses of ethylene glycol—an indicator for homicide rather than suicide—and testified that Julie's "cause of death is ethylene glycol poisoning with probable terminal asphyxia."

5. *Miscellaneous evidence.* The jury heard evidence from Jensen's coworker Nehring that Jensen reported his work computer—the computer on which Nehring had seen Jensen look up drug interactions—"had been fried and he'd have to get a new one." And the jury heard that Jensen said this on the Monday following a Friday conversation during which Nehring remarked to

464

Jensen that he was surprised that the police had not seized Jensen's work computer.

The jury learned that on the day Julie died, Jensen did not call an ambulance despite Jensen's description of her as "almost incoherent," having very labored breathing and needing help to sit up in bed. Instead, Jensen drove one son to daycare, came home for a while and then ran a work-related errand.

Nehring testified that Jensen told him that, after picking up the boys from school, "something didn't feel right" when they arrived home, so Jensen told the boys to wait in the car.

¶ 38. With the above illustrative summary of the other, untainted and undisputed gripping evidence against Jensen—from which a rational jury could alone conclude beyond a reasonable doubt that Jensen cruelly planned and plotted and, in fact, carried out the murder of his wife Julie—we move on to examine the admitted testimonial evidence for a determination as to whether the assumed error in admitting it was harmless or reversible. As already noted, we conclude that the State has met its burden of proving admission of the testimonial evidence was harmless beyond a reasonable doubt. The State deftly dissects the challenged testimonial evidence and is able to point to admissible duplicative and corroborative evidence in the record.

¶ 39. We begin with Julie's letter.[6]

---

[6] On appeal, Jensen argues that the circuit court erred in admitting Julie's letter as a "dying declaration." The State explicitly does not argue that Julie's letter was a dying declaration "because it believes the theory for admissibility" it advances "is stronger and, unlike the dying-declaration theory, not subject to a potential waiver bar." The State does, however, note that this court "could still adopt" the circuit court's rationale for

¶ 40. *Assumed inadmissible evidence.* The first two sentences of Julie's letter state: "I took this picture and am writing this on Saturday 11–21–98 at 7AM. This 'list' was in my husband's business daily planner —not meant for me to see." *Jensen,* 299 Wis. 2d 267, ¶ 7.

¶ 41. *Admissible duplicative/corroborative evidence in the record.* Julie's neighbor, Wojt, testified that Julie told him that she saw sticky notes with "different poisoning sites for different poison" on Jensen's desk and Wojt further testified that Julie was "very confused and scared, because there was some times that Mark [Jensen] left to work and he left his computer on and on the screen of the computer there was the website about the poisoning." Wojt testified that he· advised Julie to "take the pictures" of "the screen, the notes and give it to the police." Finally, Wojt testified that he knew that Julie took a picture because she told him, "I took the picture . . . and I tried to contact the police to give it to them."

¶ 42. Jensen's sister, Laura Koster, testified that in fall 1998, Julie had shown her a picture that Julie had photographed of a page from Jensen's planner and the photograph showed that in Jensen's planner, in his handwriting, he had made a "list of things." Koster said the same photograph also showed that, lying next to the planner, there was a plastic cylinder that "[a]t first glance . . . looked like a syringe."

¶ 43. Therese DeFazio, son David's teacher, testified that on November 25, 1998, while at David's school, Julie "was acting extremely nervous" and "didn't want

admitting the letter as a dying declaration. We decline to reach the dying declaration issue given our harmless error analysis. *See Gross v. Hoffman,* 227 Wis. 296, 300, 277 N.W. 663 (1938) (only dispositive issues need be addressed).

to tell" DeFazio what was on her mind and said, "I don't know if I should be telling you this." DeFazio said she told Julie that "when you're ready . . . you can tell me whatever it is that's bothering you." Julie then "started to wring her hands again and she said I think my husband is going to kill me." DeFazio said Julie then told her that she saw a list of items by Jensen's computer "such as syringes . . . and drugs and items like that." Julie told her she feared that Jensen was going to try to give her an overdose of drugs or something by putting it in her food and that Jensen was trying to get her to eat and drink things and she refused.

¶ 44. *Assumed inadmissible evidence.* The third sentence of Julie's letter states: "I don't know what it means, but if anything happens to me, he [Jensen] would be my first suspect."

¶ 45. *Admissible duplicative/corroborative evidence in the record.* Wojt, the Jensens' neighbor, testified that about one month before Julie died Julie was very confused and scared and told him that Jensen would go to work and leave his computer on with the screen displaying a website about poisoning. Wojt said Julie told him, "I don't know what [Jensen's] trying to do to me, if he's like trying to scare me, he's playing with my mind or he just forgot to turn it off." Wojt said that Julie expressed suspicions that Jensen was trying to poison her or trying to drive her nuts in order to take the kids from her. Wojt said that Julie told him that during an argument she had with Jensen, Jensen said she was an unfit mother and that he "will take the kids away from her."

¶ 46. Wojt testified that about two weeks before Julie died, she told him that Jensen was "chasing her" with a glass of wine trying to get her to drink it, that Jensen kept following her with the wine, would put it

next to her and this went on until three in the morning. Julie told Wojt that the same night she also saw their nightstand drawer left cracked open and inside the drawer she could see syringes. Julie told Wojt that she and Jensen had a huge fight that night and she refused to drink the wine and "was afraid that [Jensen] put something in the wine" and was going to "inject her with something else. That's why the syringes were there."

¶ 47. Wojt further testified that Julie told him she was "scared she was go[ing to] die; [that Jensen's] go[ing to] poison her." As mentioned earlier, son David's teacher, DeFazio, testified that Julie said, "I think my husband is going to kill me." DeFazio also testified that Julie told her that she feared that Jensen was going to try to give her an overdose of drugs or something by putting it in her food. Jensen's sister, Koster, testified that Julie told her in the fall of 1998 that she thought Jensen might be planning to kill her.

¶ 48. *Assumed inadmissible evidence.* Sentence four and five of Julie's letter states: "Our relationship has deteriorated to the polite superficial. I know [Jensen's] never forgiven me for that brief affair I had with that creep seven years ago."

¶ 49. *Admissible duplicative/corroborative evidence in the record.* Jensen admitted to Detective Ratzburg that their marriage was never the same after Julie's affair. Wojt testified that Julie repeatedly told him about marital problems she and Jensen were having. Dr. Richard Borman, the family's doctor, testified that two days before Julie's death she was in to see him and alluded to an affair that she had in the past and said she believed that Jensen had "never really forgiven" her for it.

¶ 50. Nehring testified that he first met Jensen in 1990 or 1991 and became friends with him and contin-

ued that friendship thereafter. He said they talked on the phone regularly both about business and personal things, and they did family outings together. Nehring testified that soon after he met Jensen, sometime around 1990–91, Jensen told him about Julie's affair. Nehring acknowledged that eight years after telling him about the affair, neither Jensen's anger nor his hurt diminished. He said that "[Jensen] remained upset about [the affair] and distressed over it for as long as I knew him."

¶ 51. Additionally, DeFazio testified that Julie told her that Jensen "never forgave her for [the affair]."

¶ 52. Finally, the State presented uncontroverted evidence that Jensen repeatedly placed pornographic photos around the house for Julie to find and that Jensen knew Julie believed her former paramour was planting them. This evidence is discussed in further detail later in this opinion when we address and reject Jensen's argument that impermissible other acts evidence was admitted. It is sufficient to say for now that this evidence duplicates the contested evidence put on to show that Jensen had never forgiven Julie for her affair.

¶ 53. *Assumed inadmissible evidence.* Sentence six of Julie's letter stated: "Mark lives for work and the kids; he's an avid surfer of the Internet."

¶ 54. *Admissible duplicative/corroborative evidence in the record.* Again, other undisputed evidence at trial pointed to Jensen, not Julie, being the user of their home computer. Jensen's friend and coworker, Nehring, testified that Jensen's computer skills were "above average," noting that Jensen was always buying and replacing computers and usually owned two personal computers at any time. Nehring testified that before Julie's death, Jensen conducted Internet searches on

drug interactions "on a very frequent basis." DeFazio testified that during a school open house in August 1998, she asked Julie if she could use a computer because she wanted Julie to help in the computer lab with the children, and Julie said, "[O]h, I can't do that, I don't even know how to turn one on." DeFazio also testified that David told her that he was teaching his mom how to use a computer because "she didn't know how." Finally, the time of day that Internet activity occurred was consistent with Jensen being the user. Computer evidence showed that Internet activity occurred late at night and into the early morning when Jensen would be home. The computer evidence showed that when Jensen attended a conference in St. Louis, there was no Internet activity. Additionally, during November 1998, no Internet use occurred from Monday through Friday between 9 a.m. and 6 p.m.

¶ 55. On the morning Julie died, the evidence reveals a 7:40 a.m. search on the Jensen home computer for "ethylene glycol poisoning." The computer evidence also reveals that the user of the home computer that same morning double-deleted that morning's Internet history. Jensen told Ratzburg that on the morning of Julie's death, Julie "could hardly sit up," "was not able to get out of bed," and "was not able to move around and function."

¶ 56. *Assumed inadmissible evidence.* Sentences seven and eight of Julie's letter state: "Anyway—I do not smoke or drink. My mother was an alcoholic, so I limit my drinking to one or two a week."

¶ 57. *Admissible duplicative/corroborative evidence in the record.* Dr. Borman testified that Julie denied smoking, stated that she drank alcohol occasionally and told him that her mom had alcohol problems so she was careful about alcohol consumption. Julie's

470

brother, Paul Griffin, testified that their mother was an alcoholic and that Julie "rarely" drank.

¶ 58. *Assumed inadmissible evidence.* Sentences nine and ten of Julie's letter state: "Mark wants me to drink more with him in the evenings. I don't."

¶ 59. *Admissible duplicative/corroborative evidence in the record.* As noted earlier in this opinion, the Jensens' neighbor, Wojt, provided testimony with this same information. Jensen's friend Nehring testified that Jensen told him he was trying to get Julie to relax by offering her a glass of wine at night, but she always said no. Nehring stated that Jensen told him that on only one occasion did Julie accept a drink of wine and immediately following taking a sip of wine, she fell over sideways.

¶ 60. *Assumed inadmissible evidence.* Sentence eleven of Julie's letter states: "I would never take my life because of my kids. They are everything to me!"

¶ 61. *Admissible duplicative/corroborative evidence in the record.* Julie told Borman that she loved her children "more than anything and they were the most important thing in the world to her." DeFazio testified that Julie told her she gave her neighbor a note, "saying that if my husband ever kills me please believe that I did not commit suicide, I would never do that because I love my children and I wouldn't do that to my children."

¶ 62. *Assumed inadmissible evidence.* Sentence twelve of Julie's letter states: I regularly take Tylenol and multi-vitamins; occasionally take OTC stuff for colds, Zantac, or Imodium." Borman's notes of Julie's September 1998 doctor's visit indicate she was taking a multivitamin and calcium. Whether Julie took Tylenol and occasionally took over-the-counter medications is not relevant or prejudicial.

471

¶ 63. *Assumed inadmissible evidence.* Sentence thirteen of Julie's letter states: "[I] have one prescription for migraine tablets, which Mark uses more than I." This information is not in evidence outside the letter, but is not material or prejudicial.

¶ 64. *Assumed inadmissible evidence.* Sentence fourteen of Julie's letter states: "I pray I'm wrong & nothing happens . . . but I am suspicious of Mark's suspicious behaviors & fear for my early demise."

¶ 65. *Admissible duplicative/corroborative evidence in the record.* As noted earlier in this opinion, Jensen's sister, Koster, Julie's neighbor, Wojt, and Julie's son's teacher, DeFazio, testified that Julie was suspicious of Jensen and thought he might try to kill her.

¶ 66. *Assumed inadmissible evidence.* Sentence fifteen of Julie's letter states: "However, I will not leave David & Douglas."

¶ 67. *Admissible duplicative/corroborative evidence in the record.* As noted earlier, DeFazio testified that Julie told her she wrote a letter in which she stated that she would never commit suicide. Also, Borman testified that two days before her death, Julie denied being suicidal and said her boys meant "everything" to her and she did not want to lose them.

¶ 68. *Assumed inadmissible evidence.* The last sentence of Julie's letter states: "My life's greatest love, accomplishment and wish: 'My 3 D's—Daddy (Mark), David & Douglas."

¶ 69. *Admissible duplicative/corroborative evidence in the record.* Other evidence revealed that Julie's license plate read "MY 3 DS."

¶ 70. The State's additional evidence, compared to Julie's letter, illustrates that virtually all relevant information in Julie's letter was duplicated by admissible

nontestimonial evidence from other sources. The rest of the record reflects that the jury heard overwhelming evidence of murder, and upon this record, it could rationally have concluded beyond a reasonable doubt that Jensen murdered Julie.

¶ 71. The same is true regarding Julie's testimonial statements to Kosman; that is, virtually everything related in Julie's statements to Kosman was duplicated by admissible evidence from other sources. Kosman testified that he received a voicemail message from Julie that said "to call [her] as soon as possible, and if she were to end up dead, Mark [Jensen] would be her suspect." Likewise, Wojt and DeFazio testified that Julie told them she thought Jensen was going to kill her. Kosman testified that Julie had told him she had taken photographs of notes from Jensen's planner and that she had written a note and given it to a neighbor with instructions to give it to the police if anything happened to her. Likewise, Wojt testified to the fact that Julie told him she had taken pictures of Jensen's day planner and that she was worried Jensen was planning to poison her. Wojt testified that one of the times when he and Julie were talking, she put an envelope in his coat pocket and told him that if anything happened, he should give it to the police.

¶ 72. Kosman testified that Julie told him she thought that Jensen was going to kill her and make it look like suicide. Likewise, DeFazio testified that Julie told her that she feared Jensen "was going to make it look like a suicide."

¶ 73. Thus, even assuming the testimonial evidence of Julie's letter and Julie's statements to Kosman were inadmissible under the rules of evidence and the Sixth Amendment Confrontation Clause, we deem any error in admission harmless. The sine qua non is that

the testimonial statements provided nothing significant beyond the properly admitted nontestimonial statements.

## Other Acts

¶ 74. That determined, we now address the alleged improperly admitted "other acts"[7] evidence. Jensen acknowledges that the evidence that Julie had an affair and that he had an affair was properly admitted other acts evidence to show motive. However, Jensen argues that certain categories of evidence were improperly admitted "other acts" evidence. Specifically, he takes issue with the admission of (1) the evidence that he left pornographic photos—depicting erect penises and fellatio—around the Jensen home; (2) the evidence that pornography—depicting penis pictures—was found on Jensen's home computer in 1998 and 2002; and (3) the evidence that he had quizzed Kelly Jensen[8] about her sexual history, including fellatio and details of her past partners' penis sizes. We conclude that all three categories of evidence were properly admitted.

---

[7] WISCONSIN STAT. § 904.04(2) (2007–08) provides in pertinent part:

> [E]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. This subsection does not exclude the evidence when offered for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

All references to the Wisconsin Statutes are to the 2007–08 version unless otherwise noted.

[8] Kelly Jensen is the woman Jensen was having an affair with; he married Kelly after Julie's death.

¶ 75. A circuit court's decision to admit evidence, including "other acts," is discretionary. *See State v. Webster*, 156 Wis. 2d 510, 514–15, 458 N.W.2d 373 (Ct. App. 1990), and *State v. C.V.C.*, 153 Wis. 2d 145, 161, 450 N.W.2d 463 (Ct. App. 1989). We will not disturb a circuit court's exercise of discretion if the circuit court correctly applied accepted legal standards to the facts of record and, using a rational process, reached a conclusion that a reasonable judge could reach. *See Webster*, 156 Wis. 2d 510, 514–15. The basis for the court's decision should be set forth; however, if the circuit court fails to provide reasoning for its evidentiary decision, we will independently review the record to determine whether the circuit court properly exercised its discretion. *Martindale v. Ripp*, 2001 WI 113, ¶ 29, 246 Wis. 2d 67, 629 N.W.2d 698. In admissibility determinations, an appellate court is concerned with whether a circuit court's *decision* is correct, rather than with the reasoning employed by circuit court. *See State v. Baudhuin*, 141 Wis. 2d 642, 648, 416 N.W.2d 60 (1987). If the decision is correct, it should be sustained, and we may do so on a theory or on reasoning not presented to the circuit court. *See id.*

¶ 76. Our supreme court has set forth a three-part analytical test for determining when other acts evidence can be admitted. *State v. Sullivan*, 216 Wis. 2d 768, 772, 576 N.W.2d 30 (1998). The three-part test asks the court to consider: (1) whether the evidence is offered for a permissible purpose under Wis. Stat. § 904.04(2); (2) whether the evidence is relevant; and (3) whether the probative value of the evidence is substantially outweighed by the danger of unfair preju-

dice, confusion of the jury or needless delay.[9] *Sullivan*, 216 Wis. 2d at 772.

¶ 77. Wisconsin does not prohibit the admission of other acts evidence if "offered for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Wis. Stat. § 904.04(2). The listing of circumstances under § 904.04(2) for which the evidence is relevant and admissible is not exclusionary but, rather, illustrative. *State v. Shillcutt*, 116 Wis. 2d 227, 236, 341 N.W.2d 716 (Ct. App. 1983). Accepted bases for the admissibility of evidence of other acts not listed in the statute arise when such evidence provides background or furnishes part of the context of the crime or case or is necessary to a full presentation of the case. *See id.*; *see also State v. Hereford*, 195 Wis. 2d 1054, 1069, 537 N.W.2d 62 (Ct. App. 1995).

¶ 78. Furthermore, often times evidence treated by the parties and the circuit court as "other acts" evidence is not necessarily even "other acts." In *State v. Johnson*, 184 Wis. 2d 324, 516 N.W.2d 463 (Ct. App. 1994), the majority analyzed the disputed evidence as

---

[9] This three-part test has sometimes been worded differently, apparently combining the second and third step into one step. *State v. Hunt*, 2003 WI 81, ¶ 32 n.11, 263 Wis. 2d 1, 666 N.W.2d 771 (citing *State v. Pharr*, 115 Wis. 2d 334, 340 N.W.2d 498 (1983), which held that circuit courts must apply a two-prong test in determining whether evidence of other crimes is admissible. The first prong requires the circuit court to determine whether evidence fits within one of the exceptions set forth in Wis. Stat. § 904.04, and the second prong requires the circuit court to determine whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice to the defendant).

"other acts" because the parties treated it as such. *Id.* at 339 n.2. There, Johnson's former live-in girlfriend, Karen Petersen, contended that during an argument, Johnson assaulted her. *Id.* at 334. Based on her allegations, the State charged Johnson with battery and second-degree reckless endangerment while using a dangerous weapon. *Id.*

¶ 79. Johnson's theory of defense was that Petersen falsely accused him of assault so that after he was incarcerated, she could misappropriate certain items of his personal property. *Id.* at 338. To bolster this theory, he sought to introduce evidence that within days after his arrest, Petersen approached several of the people who were storing property for Johnson and attempted to claim the property as her own. *Id.* Johnson offered it as probative of Petersen's motive for falsely accusing him of the assault. *Id.* The circuit court did not let in the evidence and Johnson was found guilty of battery and second-degree reckless endangerment. *Id.* at 333. Johnson appealed.

¶ 80. We reversed the circuit court's ruling to suppress this evidence and remanded for a new trial. *Id.* In discussing our decision, we explained that this evidence, viewed from the theory of defense, is directly linked to the criminal events charged against Johnson. *Id.* at 339. The probative value of other acts evidence is partially dependent on its nearness in time, place and circumstance to the alleged act sought to be proved. *Id.* The evidence involved the relationship between the principal actors (Johnson and Petersen), followed on the heels of Petersen's accusations against Johnson and, most importantly, traveled directly to Johnson's theory as to why Petersen was falsely accusing him. *Id.*

¶ 81. Notably, given this linkage with the offenses charged against Johnson, we questioned whether this

evidence "even required" an "other acts" analysis, and pointed the reader to the concurring opinion which further pursued this matter. *Id.* at 339 n.2. In his concurrence, Judge Anderson explained that if evidence is part of the "panorama" of evidence surrounding the offense, it is not other acts evidence and need not be analyzed as such. *See id.* at 348–49 (Anderson, P.J., concurring). Judge Anderson then explained why he did not consider this evidence to be other acts evidence:

> For Johnson's theory of defense to have any viability, Petersen's conduct cannot be viewed frame-by-frame as the State argues. The fact that Petersen's bid to secure Johnson's personal property came after the alleged assault does not make it an "other act" subject to analysis under [Wis. Stat.] § 904.04(2). A criminal act cannot be viewed frame-by-frame if the finder of fact is to arrive at the truth.

*See Johnson*, 184 Wis. 2d at 350 (Anderson, P.J., concurring).

¶ 82. Like the complained-about evidence in *Johnson*, the evidence that Jensen may have left pornographic photos—depicting such things as erect penises and fellatio—around the house was admissible, whether subjected to an other acts analysis under Wis. Stat. § 904.04(2) and *Sullivan*, or examined as "panorama" evidence under *Johnson*.

¶ 83. The State argues this was properly admitted "other acts" evidence showing that Jensen's bitterness over Julie's 1991 affair was "deep-seated and obsessive and gave him a motive to kill Julie, although it was not his sole motive." The State establishes a contextual reason for admitting the evidence in its further assertion that Jensen "orchestrated [a] campaign of harassment." While Jensen denied knowing the origin of the pornographic photos, he told Ratzburg, the investigat-

478

ing officer, that he believed Julie's former paramour was sending the photos to him at work. Jensen admitted to Ratzburg that he began saving the photos and using them to upset Julie when "something would happen" that caused him to "get pissed off." He explained that sometimes he would just leave the photos out for Julie to find and other times he would bring them out, show them to Julie and tell her that he "found these in the shed."

¶ 84. We agree with the State that if analyzed as other acts evidence, it is properly admitted motive[10] and/or context evidence under *Sullivan*. *See Sullivan*, 216 Wis. 2d at 772. The evidence that Jensen left pornographic pictures around the home is relevant: long ago, our supreme court recognized that in cases of uxoricide,[11] evidence of the defendant's ill feeling toward his wife is relevant to prove motive. *Runge v. State*, 160 Wis. 8, 12–13, 150 N.W. 977 (1915). This evidence is offered for a permissible purpose: that of establishing context and providing a full presentation of the case, i.e., Jensen's hostility and desire to seek revenge against Julie for her affair. *See Shillcutt*, 116 Wis. 2d at 236; *see also Hereford*, 195 Wis. 2d at 1069. Finally, the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.

¶ 85. Also, even if this was not admissible other acts evidence, it is admissible when analyzed as "part of the panorama of evidence" surrounding the offense. *See*

---

[10] We note that "[m]otive has been defined as the reason which leads the mind to desire the result of an act." *State v. Johnson*, 184 Wis. 2d 324, 338, 516 N.W.2d 463 (Ct. App. 1994).

[11] Uxoricide is defined as "the murder of one's wife." BLACK'S LAW DICTIONARY 1583 (8th ed. 2004).

479

*Johnson*, 184 Wis. 2d at 348–49 (Anderson, P.J., concurring). It is admissible as part of the State's theory that before Jensen murdered his wife, Jensen engaged in a campaign of emotional torture by repeatedly confronting Julie with pornographic photos. The evidence involved the relationship between the principal actors (Jensen and Julie) and traveled directly to the State's theory as to why Jensen murdered Julie. *See id.* at 339.

■■■

¶ 86. The second category of evidence that Jensen claims is inadmissible other acts—evidence that pornography was found both on Jensen's home computer in 1998 and office computer in 2002—was properly admitted "panorama" evidence. For the finder of fact to arrive at the truth, it was proper not to limit the evidence to a frame-by-frame presentation. *See id.* at 350 (Anderson, P.J., concurring). The evidence that Jensen secretly planted pornography around the home gave viability to the State's theory of the case that Jensen had been engaging in a campaign of emotional torture toward Julie up to the time he poisoned her. *See, e.g., id.* We agree with the circuit court that because Jensen persistently denied leaving the pornographic photos, evidence of the pornography found on his work computer in 2002—long after Julie's death—was relevant to prove him the source of the pornography found on the Jensen home computer in 1998, which, in turn, was relevant to show Jensen left the pornographic photos around the Jensen home.

¶ 87. What is more, the similarity of what was specifically depicted in most of the pictures, i.e., penis-focused pornography, made it even more relevant to proving the State's case because the evidence, showing that Jensen was storing penis photos on his computer in 2002, bolstered the State's theory that Jensen had

accessed similar penis pornography on the home computer in 1998, which, in turn, linked him to being the one who left similar penis-focused pornographic photos around the home.

¶ 88. Moreover, this evidence is highly probative to another key issue in the trial that the State was seeking to establish: that Julie knew very little about computers and rarely used the home computer while, in contrast, Jensen was computer savvy and surfed the Internet regularly at home. The circuit court observed that the defense had impeached Detective Ratzburg's testimony—i.e., that Jensen told him right after Julie's death that he was the principal computer user and that Julie rarely used their computer—by pointing out that Ratzburg never included this information in any report. Plainly, given the critical issue as to who had searched for ethylene glycol and other poisons on the home computer, evidence tending to show Jensen was by far the primary user of the computer had great probative value outweighing any unfair prejudice.

¶ 89. The third category of evidence Jensen claims was inadmissible other acts evidence is the evidence that Jensen had quizzed Kelly Jensen about her sexual history, including fellatio and details of her past partners' penis sizes. This evidence also qualifies as properly admitted "panorama" evidence because it, too, tended to show that Jensen (a) had a longstanding fascination or obsession with penises and (b) given this, was likely the one responsible for the penis-focused photos stored on the home and office computer and left around the Jensen home to emotionally torture Julie.

¶ 90. Each category of evidence Jensen complains about was properly admitted, even if the circuit court's reasoning for admitting the evidence differs from ours,

its decision to admit was correct and we, therefore, sustain the circuit court's determination under our deferential standard of review. *See Baudhuin*, 141 Wis. 2d at 648.

## Search Warrant

¶ 91. Like Jensen's preceding arguments, Jensen's additional arguments do not sway this court from affirming. Jensen claims that "[t]he search of [his] home and seizure of his computer without a warrant exceeded the scope of the consent to search." Warrantless searches are per se unreasonable under the Fourth Amendment, subject to a few carefully delineated exceptions. *State v. Sanders*, 2008 WI 85, ¶ 27, 311 Wis. 2d 257, 752 N.W.2d 713. The consent search is one exception. WIS. STAT. § 968.10(2). A consent search is constitutionally reasonable to the extent that the search remains within the bounds of the actual consent. *State v. Douglas*, 123 Wis. 2d 13, 22, 365 N.W.2d 580 (1985). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness —what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991).

¶ 92. Jensen argues that the consent form language, "any letters, writings, paper, materials, or other property," limited the consent to the seizure of documents and similar items. He also argues that "[n]o reasonable person would have anticipated that a search for evidence relating to a death would have extended to seizing and searching Mr. Jensen's home computer." We cannot agree. As already noted, the form Jensen signed

specifically stated: "I, Mark Jensen, fully realize my right to refuse to consent to this said search and seizure. I do hereby authorize the said police officers to take from my premise, automobile and/or person any letters, writings, paper, materials or other property which they may desire."

¶ 93. A reasonable person who consents to a police search and seizure of "other property which they may desire" would not believe that "other property" was limited to papers and written material. There is no meaningful difference between records maintained electronically and those kept in hard copies and, in this age of modern technology, persons have increasingly become more reliant on computers not only to store information, but also to communicate with others. *See Commonwealth v. McDermott*, 864 N.E.2d 471, 488–89 (Mass. 2007). "[C]lairvoyance cannot be expected of police officers to know in what form a defendant may maintain his records." *Id.* at 488. We conclude that the consent form signed by Jensen authorized police to seize the electronic storage media (computers and disks) within which the documents listed in the warrant may have been stored.

### Judicial Bias

¶ 94. Jensen's next argument is that Judge Schroeder's pretrial forfeiture by wrongdoing finding of guilt by a preponderance of the evidence rendered the judge biased and violated Jensen's due process right to a fair trial. Jensen has waived this argument because he failed to present it in the circuit court. *See Apex Elecs. Corp. v. Gee*, 217 Wis. 2d 378, 384, 577 N.W.2d 23 (1998)

("[t]he oft-repeated rule of Wisconsin appellate practice is that issues not raised in the circuit court will not be considered for the first time on appeal").

¶ 95. Further, even if this argument had not been waived, it lacks merit. The right to a fair trial includes the right to be tried by an impartial and unbiased judge. *State v. Walberg*, 109 Wis. 2d 96, 105, 325 N.W.2d 687 (1982). Whether Judge Schroeder was a neutral and detached magistrate as mandated by the United States and Wisconsin Constitutions is a question of constitutional fact that we review de novo without deference to the circuit court. *See State v. McBride*, 187 Wis. 2d 409, 414, 523 N.W.2d 106 (Ct. App. 1994). There is a presumption that a judge is free of bias and prejudice. *Id.* In order to overcome this presumption, the party asserting judicial bias must show by a preponderance of the evidence that the judge is biased or prejudiced. *Id.* at 415.

¶ 96. Jensen makes no such showing. Under WIS. STAT. § 901.04, a judge must make preliminary evidentiary findings such as the finding Judge Schroeder made that Jensen was guilty of forfeiture by wrongdoing.[12] Moreover, Judge Schroeder was ordered by our supreme court to make a forfeiture by wrongdoing finding. Additionally, Jensen points to nothing to support his implied contention that a judge who makes the

---

[12] WISCONSIN STAT. § 901.04 provides in pertinent part:

(1) QUESTIONS OF ADMISSIBILITY GENERALLY. Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the judge, subject to sub. (2) and ss. 971.31(11) and 972.11(2). In making the determination the judge is bound by the rules of evidence only with respect to privileges and as provided in s. 901.05.

preliminary finding of forfeiture by wrongdoing must recuse himself or herself from the trial. Finally, Jensen proffers no objective evidence of bias. We address this argument no further.

## Interest of Justice

¶ 97. Jensen's final argument is that we should reverse his conviction in the interest of justice. We disagree. Our discretionary reversal power under WIS. STAT. § 752.35 is formidable and should be exercised sparingly and with great caution. *State v. Williams*, 2006 WI App 212, ¶ 36, 296 Wis. 2d 834, 723 N.W.2d 719. We are reluctant to grant new trials in the interest of justice and exercise our discretion to do so "only in exceptional cases." *See State v. Armstrong*, 2005 WI 119, ¶ 114, 283 Wis. 2d 639, 700 N.W.2d 98. While this case is "exceptional," it is so only because of the staggering weight of the untainted evidence and cumulatively sound evidence presented by the State to a jury of Mark Jensen's peers leading it to convict Jensen beyond a reasonable doubt of murder in the first degree. Because the State has proven beyond a reasonable doubt that any error complained of did not contribute to the verdict obtained, Jensen is not entitled to a new trial and his conviction stands. *See Stuart*, 279 Wis. 2d 659, ¶ 40 (citing *Chapman*, 386 U.S. at 24); *see also Harvey*, 254 Wis. 2d 442, ¶ 46. Upon review of the extensive record and briefing on appeal, we affirm.

*By the Court.*—Judgment affirmed.