# COURT OF APPEALS
## DECISION
## DATED AND FILED

## February 4, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal Nos.** **2024AP618-CR**
**2024AP619-CR**

Cir. Ct. Nos. 2020CF591
2020CF1453

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT II

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

DEREK D. FECISKONIN,

DEFENDANT-APPELLANT.

APPEALS from judgments and orders of the circuit court for Waukesha County: BRAD SCHIMEL, Judge. *Affirmed*.

Before Neubauer, P.J., Gundrum, and Lazar, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.   In these consolidated appeals, Derek D. Feciskonin appeals judgments of conviction, entered following a consolidated jury trial, for various crimes committed against his wife, Hannah.[1]   He also appeals orders denying postconviction relief.  On appeal, Feciskonin argues the circuit court erred by admitting dozens of pieces of other-acts evidence without a *Sullivan*[2] analysis, by admitting evidence of Hannah's affair with their neighbor, Matthew, in violation of Wisconsin's rape-shield law, and by excluding certain sexual text-message exchanges between Hannah and Feciskonin.  Feciskonin also argues trial counsel was ineffective for failing to object to the other-acts evidence and evidence that Feciskonin was incarcerated and for failing to request curative jury instructions.  Finally, Feciskonin asserts the errors amount to plain error requiring reversal or a new trial in the interest of justice.

¶2    We reject Feciskonin's arguments.  As a threshold matter, Feciskonin's other-acts claims are reviewable only as ineffective-assistance-of-counsel claims because, as Feciskonin argues, counsel did not object when the evidence was introduced.  We conclude almost all of the complained-of evidence was not other-acts evidence, and, of the limited other-acts evidence that was admitted, Feciskonin's trial counsel was not ineffective.  Counsel was also not ineffective for failing to object to evidence of Feciskonin's incarceration or to request curative jury instructions.  We then conclude the circuit court did not err by excluding certain sexual text messages Hannah sent to Feciskonin, and that the

---

[1] Pursuant to the policy underlying WIS. STAT. RULE 809.86(4) (2023-24), we use a pseudonym when referring to Feciskonin's wife and his neighbor.

All references to the Wisconsin Statutes are to the 2023-24 version.

[2] *State v. Sullivan*, 216 Wis. 2d 768, 576 N.W.2d 30 (1998).

admission of the affair between Hannah and Matthew was harmless. Finally, we conclude the cumulative effect of the purported errors does not amount to plain error and does not require a new trial in the interest of justice. We affirm.

## BACKGROUND

¶3 In broad strokes, the State charged Feciskonin in two complaints with crimes committed against his wife, Hannah. The first complaint described a physical altercation that occurred in May 2020 that resulted in Hannah being transported to the hospital with a serious head wound. There, the State charged Feciskonin with strangulation and suffocation, substantial battery, and disorderly conduct, all as acts of domestic abuse.

¶4 While that case was pending, Feciskonin was charged in a second case. That criminal complaint described that, in September 2020, Feciskonin was involved in an altercation with Hannah and Matthew, during which he broke down a door and grabbed Hannah's breast. During the September incident, Hannah disclosed to the responding officer that Feciskonin had been sexually assaulting her since he learned of the affair more than one year ago, in August 2019. Hannah described two sexual assaults that she said occurred prior to the May 2020 incident.[3] In this complaint, the State charged Feciskonin with two counts of second-degree sexual assault, one count of fourth-degree sexual assault, criminal damage to property, felony bail jumping, and disorderly conduct, all as acts of domestic abuse.

---

[3] At trial, Hannah testified that one of these two incidents occurred in September 2020. In her recorded interview with the sensitive crimes detective that was played for the jury, Hannah told the detective that both incidents happened prior to the domestic incident in May 2020.

3

¶5    The cases were joined for trial. As relevant, prior to trial, Feciskonin filed two motions in limine. He first asserted that any evidence of the affair between Hannah and Matthew should be excluded pursuant to Wisconsin's rape-shield law. The State opposed the motion, arguing evidence of Hannah's affair was paramount to the motive behind Feciskonin's assaultive behavior. The court denied Feciskonin's motion. It reasoned that the evidence was not being offered as a way to embarrass Hannah or Feciskonin; rather, it was being offered to prove motivation.

¶6    Feciskonin also moved to introduce six sexual text-message exchanges between Hannah and Feciskonin that occurred during the relevant time period. He argued the messages depicted Hannah's sexual desires and fantasies regarding Feciskonin and were therefore not subject to the rape-shield law and admissible. The State objected. The State asserted there would be no dispute at trial that, from August 2019 through September 2020, there were multiple incidents of consensual sex. The State argued the text messages were subject to the rape-shield protections, and, in any event, the text messages were inflammatory and highly prejudicial to Hannah.

¶7    The circuit court agreed with the State. It characterized the text messages as "salacious and titillating." It explained that the rape-shield statute "is not the only potential bar to evidence coming in" and evidence "may be kept out if it's irrelevant, immaterial or unfairly prejudicial. That is where I am running into a problem is the unfairly prejudicial part of it." The court continued:

> I am hearing that there is no question that consensual sex continued between these two, this is just gratuitous. It doesn't serve any other purpose but potential embarrassment and humiliation. That is where I am at. Now if we run into a problem that the alleged victim denies the consensual relationship, denies that they continued to

4

have sex after all of these times, then we have a different issue. We will have to take that up then.

But at this point I am going to direct that cross examination of the victim be limited to those things that are less salacious than these things.

¶8 The State also filed a pretrial motion to introduce other-acts evidence. Specifically, the State wanted to introduce evidence that, in October 2017, Feciskonin threw keys at Hannah, punched her, and pushed her to the ground, which caused injury to Hannah's head, hip, and thigh. Feciskonin was charged with various crimes for that incident, and pursuant to a plea agreement, he pled to bail jumping and the other charges were dismissed and read in. The State offered this other-acts evidence to prove Feciskonin's intent, lack of mistake, and motive. The State argued the evidence was relevant and not unfairly prejudicial when applying the greater latitude rule.

¶9 The circuit court conducted a *Sullivan* analysis. It ultimately denied the admission of this evidence in the State's case-in-chief. It explained that, between the October 2017 incident and the incidents charged in this case, Feciskonin learned of Hannah's affair and that information potentially changed his motive. The court stated the October 2017 incident would be most relevant to prove lack of mistake or accident; however, without knowing how Feciskonin intended to present his case, the evidence was not yet admissible to prove lack of mistake or accident. It advised the State the evidence would only be admissible in the State's rebuttal based on the nature of Feciskonin's defense.

¶10 The case proceeded to trial. At trial, Hannah testified that, on May 7, 2020, she returned home from work. When she arrived home, Feciskonin was intoxicated. Feciskonin's nine-year-old daughter (Hannah's step-daughter)

5

was at their residence.  Hannah and Feciskonin's daughter began arguing about a phone charger, and Feciskonin intervened.

¶11    At some point, Feciskonin believed Hannah had taken his daughter's phone.  In response, he threw a Bluetooth speaker at Hannah, and the speaker lodged into the basement door, creating a hole.  Hannah got to the kitchen floor, and Feciskonin kicked her.  He also punched her in the face.  Hannah screamed for Feciskonin's daughter to show him that she had her phone, which she did.

¶12    Hannah made it over to the other side of the kitchen, but Feciskonin pushed her and she fell, hitting her head.  Feciskonin was then on top of her, choking her.  Hannah testified that Feciskonin's daughter was "screaming, just screaming in terror" for Feciskonin to stop.  When Feciskonin got off of Hannah, the back of Hannah's head was "soaked in blood."  Hannah got up, and Feciskonin tried to push Hannah down the basement stairs.  Hannah put her hands on the walls of the stairway to prevent herself from falling.

¶13    Eventually, Feciskonin told his daughter to call her mother to be picked up.  After Feciskonin's daughter left, Feciskonin "calmed down a bit."  He helped Hannah remove bobby pins that were lodged in her head, looked at her bloody head laceration, and they went to bed.

¶14    Approximately thirty minutes later, somebody arrived at the front door.  Hannah could hear Feciskonin "shouting and arguing with" the person at the door, and she realized it was the police.  Hannah told officers she needed medical attention because her head continued to bleed.  She was taken to the hospital.  She needed five staples in her head to close the laceration.

¶15    The jury was shown pictures of Hannah and Feciskonin's residence that had been taken following the incident. Hannah identified the blood on the kitchen floor and on the walls of the basement stairs as hers.

¶16    Hannah stated that after Feciskonin was arrested and charged, she asked the court if Feciskonin could come home so long as he remained sober. The court changed its order, and Feciskonin returned home.

¶17    On September 22, 2020, Hannah called police in response to another incident with Feciskonin. She explained she and Feciskonin had been out and when they arrived home, they saw their duplex neighbor, Matthew, arriving home. Hannah tried to go inside to avoid Matthew, but Feciskonin insisted that she stay outside so their son could play. Feciskonin went inside to take a shower.

¶18    Matthew later came outside with his thirteen-year-old daughter to fold up a tent. Suddenly, Feciskonin "opened the back door and started shouting profanities to [Hannah] and [Matthew]." Hannah got Feciskonin back in their house. She put her back to the door and blocked Feciskonin to keep him inside. Feciskonin shouted at her and spit in her face. He grabbed her breast, and he took off his shorts and told Hannah to give him oral sex. Hannah refused and pleaded with him to stop. When Hannah removed herself from the door, Feciskonin returned outside to confront Matthew. Hannah locked the door behind him and called 911. The jury listened to a portion of Hannah's 911 call. Feciskonin then kicked the door open, told Hannah she was "stupid for calling 9-1-1" because "no one would believe [her]" and left.

¶19    When police arrived, Hannah showed them the damage to the back door. She explained that some of the damage was from a different incident when

Feciskonin had broken in. The jury was shown a photograph of the door, and Hannah circled the new damage.

¶20 Hannah also disclosed to the responding officer that Feciskonin had been sexually assaulting her since he learned about her affair with Matthew. Hannah explained there were lots of times that the two had consensual sex during this time period; however, there were incidents of forced sexual contact. Hannah testified that there were two incidents that she could remember vividly.

¶21 One incident occurred in "March, possibly April" of 2020. Hannah and Feciskonin were in their bedroom. Feciskonin wanted to have sex; Hannah did not. Feciskonin began insulting Hannah about her affair with Matthew and began trying to force Hannah's legs open. Hannah told Feciskonin that he "didn't have a right to do this. That it was still rape even though he was my husband." Hannah began crying, Feciskonin put his penis in her vagina, ejaculated inside of her, "then stood up, laughed at [her], [and] called [her] a whore."

¶22 As to the other incident, it was "closer to [Feciskonin's] arrest in September." Feciskonin wanted oral sex, and Hannah said no. Hannah escaped into the bathroom, but Feciskonin followed her. He managed to force his penis into her mouth and held the back of her head so she could not escape. Hannah was crying and gagging. Feciskonin made derogatory remarks to Hannah during the assault. Feciskonin ejaculated into her mouth, and he left. Hannah did not call the police after either incident because she was afraid no one would believe her.

¶23 After the bathroom incident, Feciskonin sent Hannah a text message referencing the sexual assault. The text message was admitted into evidence and stated, in relevant part:

I'm sorry I let you suck me til I busted but knowing that['] s not me got me more fucking fired up the fact that[]y[o]u[]were crying while you[]suck[e]d my dick is what I need to start the conversation … just know you sucking my dick that way hurt me way more than you.

¶24    Hannah explained that she finally reported the sexual assaults when police were called following the September 2020 altercation with Matthew. She stated that once she made the decision to leave Feciskonin, she felt confident to report them and believed he would not "be able to come after me" because he was in custody.

¶25    On cross-examination, defense counsel elicited testimony from Hannah that she failed to disclose the sexual assaults to the police or her victim/witness advocate following her May 2020 head injury. Hannah also admitted that, following the May incident, she waived the 72-hour no-contact provision.

¶26    On redirect, when discussing whether Hannah disclosed the assaults to anyone prior to September 2020, the jury was read a message Hannah sent to Matthew on March 16, 2020. The message stated:

[T]hanks for being the reason I get beat tonight. I already got raped. He just wants more ammo. Don't even entertain it. My black eye just healed. My boss can confirm it if you don't believe me. Every time this topic comes up, he hurts me. Please for my safety or for my safety please don't talk to him about it.

¶27    Matthew testified that he could hear fighting and Hannah screaming for help through their duplex wall during the May incident. As to the September 2020 incident, Matthew testified Feciskonin rushed him while he was in his backyard with his daughter. Matthew also stated that before that incident, Hannah told him that Feciskonin had been "forcing himself on her" and "[f]orcing her to

9

give oral" and that she asked Matthew to stop talking to Feciskonin because Feciskonin would "take it out on her." Matthew showed police surveillance video of the September 2020 incident.

¶28    The State also called as witnesses various law enforcement officers. The jury heard from the officers who were dispatched in response to the May incident. Dispatch reported the caller's daughter had been at Feciskonin's house earlier that evening and the daughter told the caller that Feciskonin struck Hannah and she was bleeding. When police arrived at Feciskonin's door, he was uncooperative and did not want police to talk to or check on Hannah. The jury heard audio from police's encounter with Feciskonin during this incident.

¶29    Law enforcement officers also testified about responding to Hannah's September 911 call and interviewing her about the domestic abuse and sexual assaults. The jury heard portions of interviews Hannah had with police. During these interviews, Hannah told officers that she had been sexually assaulted approximately 10 times with 3 incidents of forced penetration but she could only remember 2 incidents vividly.

¶30    As for Feciskonin's defense, a defense investigator reviewed text messages between Hannah and Feciskonin during the charging period. He introduced several messages sent between June and September 2020. In these messages, Hannah discussed self-harm and suicide, said that she loved Feciskonin, and responded playfully to texts from Feciskonin. On cross-examination, the investigator acknowledged that Hannah sent other messages to Feciskonin referencing his "insulting and derogatory comments and mental abuse" of her, her lack of sexual attraction to him "after how bad [he] beat [her]," and the times when he "raped or sexually forced [her] to please [him]."

¶31     Feciskonin testified.  He stated that when he found out about Hannah's affair with Matthew, he "brushed it off" and it "didn't really bother [him] until [Matthew] kept bringing it up.  And [Hannah] would throw it in [his] face if [they] would have sex or something and she would be like if you don't want to do it, then I know somebody who will."

¶32     As to the May 2020 incident, Feciskonin testified that Hannah was arguing with his daughter over a phone charger, and he became upset over how Hannah was treating his daughter.  Eventually Hannah started "[t]hreatening to hit [Feciskonin's daughter] or beat her ass."  Feciskonin then saw Hannah "in like a charging motion coming around the corner … toward my daughter.  I did get in between and … used my chest to block my wife."  Hannah stumbled back, hit her head on the bar stool and fell to the ground.  Feciskonin observed Hannah was bleeding and told her he needed to get her to urgent care, but Hannah refused.

¶33     Feciskonin testified that between August 2019 and September 2020, he and Hannah regularly had consensual sex that was, at times, "rough and aggressive."  Hannah initiated sex 30 percent of the time, and she often sent him "pictures or messages" about how she wished to "please [him]."  He also stated that both he and Hannah used crude language with each other.

¶34     As to the September 2020 incident, Feciskonin testified that he had been on a walk with Hannah.  Feciskonin wanted to divorce Hannah because of her mental health issues.  Specifically, he explained he "couldn't take the talking about cutting herself, talking about hanging herself.  You know, just all of the death stuff that she was saying -- I just -- I am a pretty positive person.  Actually I am really positive.  She is very negative."

¶35    When they returned home, Matthew was outside. Feciskonin told Hannah to stay outside with their son because their son wanted to play. Feciskonin went inside to shower, when he returned outside, he saw Matthew:

> kneeling down by his tent and he looks back over his knee and smiles at me and then that just set me off because I had told him that it bothers me that he's always out there when she is out there.

Feciskonin stated he got verbally aggressive with Matthew:

> I told him he's a piece of shit. He's not getting my wife's pussy no more. I told him that I wanted to beat the shit out of him.

Hannah "ended up pushing me back in the house and she is like don't, just leave him alone. I am begging you. She is like I am begging you, what do you want me to do. I dropped my shorts and I said, suck my dick." He never spit on Hannah or grabbed her breast.

¶36    Feciskonin stated Hannah got out of the doorway, and he returned outside to confront Matthew. He then tried to return to the house, but Hannah had locked him out. He knocked, and he texted Hannah twice asking to please be let back in. Feciskonin then explained, "our door was held together with a couple of screws, so I just bumped it once with the right side of my hip and it damn near opened. So I just hit it again, walked in." He continued, "I grabbed my stuff from the kitchen. I said, I am not going to hurt you." He left.

¶37    On cross-examination, the State began by discussing the May 2020 incident. Feciskonin denied knocking Hannah down and asserted she tripped and fell. Once Feciskonin agreed the May 2020 incident was an accident, the State elicited other-acts evidence from him regarding the October 2017 assault.

12

¶38 As to the sexual assaults, Feciskonin testified he never forced Hannah to have sex with him. He said if Hannah said no, they did not have sex. Feciskonin admitted that Hannah had been crying during one incident of oral sex and that he sent a text message apologizing; however, Feciskonin explained Hannah was crying because she thought Feciskonin no longer desired her. Feciskonin denied holding the back of her head, not letting her leave, or that she was gagging.

¶39 Feciskonin also testified that Hannah tried to commit suicide right after she disclosed the affair to him because "[s]he was disgusted with herself for making that decision to cheat" and he woke up "to her lifeless body next to me." The State then elicited testimony from Feciskonin that after her suicide attempt, she went to the hospital. When the State asked if he knew Hannah was "covered in bruises inflicted by [him] when she had to go to the hospital[,]" Feciskonin replied, "They were not inflicted by me."

¶40 The State and Feciskonin also discussed the September 2020 incident. Feciskonin agreed with the State that when he broke the door and reentered their residence, Hannah was "cowering" because she was afraid of him, and he told Hannah he would not hurt her. The following exchange occurred:

> Q. That fear that she had was based on all of the other times you have beat her; right?
>
> A. No. I don't beat my wife.
>
> Q. You don't?
>
> A. I don't beat my wife. I don't force her to do anything. If anything, I encourage her. I send her messages talking about how beautiful she is. I send her messages about how beautiful, strong, a great mother, all of those things. Yes, I have said negative things on occasions. It's not like it was a daily thing.

13

Q. You didn't beat your wife in October of 2017 when you were arrested?

A. I did not.

Q. You didn't beat your wife in August of 2019 after she told you about the affair?

A. I did not.

Q. You didn't beat your wife on May 7, 2020 when she ended up with a laceration requiring five staples?

A. I did not. I chest bumped her.

Q. You didn't beat your wife in March of 2020 by hitting her in the face with a beer can and causing her to have a black eye?

A. No.

Q. You're aware she took pictures of her black eye after that incident?

A. I remember that she did.

Q. You remember that she took pictures of the black eye you had given her?

A. I didn't give it to her.

Q. Mr. Feciskonin, I am going to hand you first what has been marked as Exhibits 59, 60 and 61 and 62. You recognize those all to be photographs of your wife?

A. I do.

Q. Those appear to be selfies, pictures she took herself with her camera?

A. Correct. This is what we are considering the black eye?

Q. You see that in two separate sets of photographs th[is] one shows her with no make up and you can clearly see bruising around her eyes and the other is her face caked in make up as she tries to cover it up; right?

A. I see that.

Q. That was her attempt to cover up bruises that you had given her; right?

14

A. Correct.

¶41   Ultimately, the jury convicted Feciskonin of both counts of second-degree sexual assault, substantial battery, felony bail jumping, criminal damage to property, and two counts of disorderly conduct, all as acts of domestic abuse. He was acquitted of strangulation and suffocation and fourth-degree sexual assault. The court sentenced Feciskonin to prison.

¶42   Feciskonin filed a postconviction motion. Feciskonin argued the court erred by admitting dozens of other acts into evidence without a *Sullivan* hearing. He also argued trial counsel was ineffective for failing to object to the other-acts evidence, for failing to object to references of Feciskonin being incarcerated, and for failing to request curative jury instructions. He then contended the court erred by admitting evidence of Hannah's affair with Matthew and by excluding sexual text messages Hannah sent to Feciskonin. Feciskonin also argued the errors amount to plain error requiring reversal or a new trial in the interest of justice.

¶43   Following extensive briefing and a *Machner*[4] hearing, the circuit court denied Feciskonin's motion. He appeals. Additional facts will be addressed below.

## DISCUSSION

¶44   On appeal, Feciskonin renews his argument that the circuit court erred by admitting dozens of pieces of other-acts evidence into evidence without a *Sullivan* analysis, by admitting evidence of Hannah's affair with Matthew, and by

---

[4] *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

excluding certain sexual text message from Hannah to Feciskonin. Feciskonin also argues trial counsel was ineffective for failing to object to the other-acts evidence and evidence that Feciskonin was incarcerated as well as for failing to request curative jury instructions. Finally, Feciskonin asserts that all the errors amount to plain error requiring reversal or a new trial in the interest of justice.

## I.    Other-acts evidence

¶45    Feciskonin primarily seeks relief based on the introduction at trial of dozens of pieces of what he contends are inadmissible other-acts evidence. Feciskonin argues these claims both directly under *Sullivan* and as ineffective-assistance claims under *Strickland*.[5]  However, at trial, the only other-acts incident that the circuit court admitted following a *Sullivan* analysis was the October 2017 incident. On appeal, Feciskonin does not argue the admission of the October 2017 incident was improper. Instead, Feciskonin points to dozens of other pieces of evidence that he argues the court improperly admitted into evidence without first conducting a *Sullivan* analysis.

¶46    However, because Feciskonin failed to object to the admission of this evidence all of these purported evidentiary errors are reviewable only as ineffective-assistance-of-counsel claims. *See State v. Carprue*, 2004 WI 111, ¶47, 274 Wis. 2d 656, 683 N.W.2d 31 (unobjected-to errors are reviewed "within the rubric of ineffective assistance of counsel" (citation omitted)).  We will therefore address Feciskonin's other-acts arguments within the ineffective-assistance-of-counsel rubric.

---

[5] *Strickland v. Washington*, 466 U.S. 668 (1984).

16

## II.     Ineffective assistance of counsel

¶47     Feciskonin argues trial counsel was ineffective for failing to object to the admission of dozens of pieces of inadmissible other-acts evidence, for failing to object to references to Feciskonin's incarceration, and for failing to request curative jury instructions.  To establish a claim of ineffective assistance, Feciskonin must prove both: (1) deficient performance by counsel; and (2) prejudice resulting from that deficient performance.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).  We need not address both elements of the ineffective assistance test if the defendant fails to make a sufficient showing on one of them.  *State v. Dalton*, 2018 WI 85, ¶32, 383 Wis. 2d 147, 914 N.W.2d 120.

¶48     "To demonstrate deficient performance, a defendant must show that counsel's representation fell below an objective standard of reasonableness considering all the circumstances."  *Id.*, ¶34.  "In evaluating counsel's performance, this court is highly deferential to counsel's strategic decisions." *Id.*, ¶35.  We must make "every effort ... to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.

¶49     "To prove prejudice, a defendant must establish that 'particular errors of counsel were unreasonable' and 'that they actually had an adverse effect on the defense.'" *State v. Sholar*, 2018 WI 53, ¶33, 381 Wis. 2d 560, 912 N.W.2d 89.  We evaluate whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A

reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

### A. Other-acts evidence

¶50 Feciskonin asserts trial counsel was ineffective at trial for failing to object to

> over 40 references to uncharged other acts of physical and sexual violence. Among other things, the jury heard Mr. Feciskonin sexually assaulted Hannah 10 times in a matter of months, with 3 instances of forced penetration, woke her in the middle of the night to force her to perform oral sex, knocked down a door when she locked him out, beat her to the point of being covered in bruises, and punched her in the face with a beer can in his hand.

¶51 Feciskonin's brief-in-chief contains a 14-page list of all the purported inadmissible other-acts evidence that was admitted without objection at trial. He divides this evidence into four categories (witness testimony, exhibits, opening/closing statements, and the State's questioning).

¶52 The State responds that several of the challenged statements Feciskonin identifies—i.e., the third and fourth categories comprising statements by the State in opening and closing and the State's cross-examination questions—are not "evidence" and therefore counsel was not ineffective for failing to make an evidentiary objection at trial. Although we agree with the State that statements of attorneys, opening statements, and closing arguments are not "evidence," *see* WIS JI—CRIMINAL 101 (2001), 157, 160 (2000), it nevertheless remains that if the State describes inadmissible other-acts evidence in opening statements, closing arguments, or during witness examination, trial counsel may nevertheless be ineffective for failing to object to these statements or questions as improper other-acts references. We therefore will consider whether trial counsel was

ineffective for failing to object to any statements made by the State that referenced any improper other-acts evidence.

¶53     Turning to the challenged evidence and statements, the State asserts that almost everything Feciskonin challenges on appeal was not other-acts evidence.   Instead, the State argues the challenged statements and evidence were properly admitted context and panorama evidence.   According to the State, because the complained-of evidence and statements were not other-acts evidence, counsel was not ineffective for failing to object on that basis.

¶54     We will start our analysis by determining what is and is not other-acts evidence.   We then determine whether counsel was ineffective for failing to object to the admission of any other-acts evidence or the State's use of any improper other-acts evidence in its opening/closing or during cross examination.

### 1.     Nature of the evidence

¶55     "Other-acts evidence" refers to evidence of a person's prior crimes, wrongs, or acts that is introduced in a case.   Under WIS. STAT. § 904.04(2)(a), such evidence "is not admissible to prove the character of a person in order to show that the person acted in conformity therewith."   However, such evidence may be admitted for other purposes, such as proving "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."   *Id.* The admissibility of other-acts evidence is governed by the three-prong *Sullivan* analysis, which requires courts to determine: (1) whether the evidence is offered for a permissible purpose; (2) whether the evidence is relevant; and (3) whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or other considerations.   *State v.*

*Sullivan*, 216 Wis. 2d 768, 772, 576 N.W.2d 30 (1998). In domestic violence cases, there is a greater latitude to admit other-acts evidence. WIS. STAT. § 904.04(2)(b).

¶56    However, evidence "is not 'other acts' evidence if it is part of the panorama of evidence needed to completely describe the crime that occurred and is thereby inextricably intertwined with the crime." *State v. Dukes*, 2007 WI App 175, ¶28, 303 Wis. 2d 208, 736 N.W.2d 515; *State v. Jensen*, 2011 WI App 3, ¶¶81, 85-86, 331 Wis. 2d 440, 794 N.W.2d 482. "Panorama evidence" is evidence that provides context, background, or a complete picture of the crime. It is frequently relevant and admissible in cases where the dynamics in an intimate or domestic relationship are central to the charges. *See, e.g.*, *Jensen*, 331 Wis. 2d 440, ¶85 (evidence that Jensen left explicit photos around the house "involved the relationship between the [two] principal actors" and explained Jensen's treatment of victim leading up to her murder).

¶57    Panorama evidence is not subject to the three-prong *Sullivan* test. Instead, this evidence is subject to the general evidentiary balancing test. The evidence is admissible as long as it is relevant and its probative value is not outweighed by the danger of unfair prejudice or other related concerns. *See* WIS. STAT. §§ 904.02, 904.03.

¶58    We have previously noted a trend in criminal cases where parties misidentify evidence as other-acts evidence. *State v. Bauer*, 2000 WI App 206, ¶7 n.2, 238 Wis. 2d 687, 617 N.W.2d 902. "[S]imply because an act can be factually classified as 'different'—in time, place and, perhaps, manner than the act complained of—that different act is not necessarily 'other acts' evidence in the eyes of the law." *Id.* When the purpose of admitting particular evidence is not to

show a similarity between the other act and the alleged act then it is questionable whether it is other-acts evidence at all. *See id.*; **State v. Seefeldt**, 2002 WI App 149, ¶21, 256 Wis. 2d 410, 647 N.W.2d 894, *aff'd.*, 2003 WI 47, 261 Wis. 2d 383, 661 N.W.2d 822; *see also* **State v. Hereford**, 195 Wis. 2d 1054, 1069, 537 N.W.2d 62 (Ct. App. 1995) (citation omitted) ("Testimony of other acts for the purpose of providing the background or context of a case is not prohibited by [WIS. STAT. §] 904.04(2).").

¶59     Here, we have reviewed each item on Feciskonin's 14-page list and placed each challenged statement or exhibit within the context of the trial.[6] After review, we agree with the State that almost all of the complained-of evidence is not other-acts evidence.[7]

¶60     For example, the first bullet point of Feciskonin's 14-page list contains a complaint that "Hannah told the jury Mr. Feciskonin 'often used force for sexual things.'" Feciskonin argues this statement was improper other-acts evidence.

---

[6] In Feciskonin's list of purported other-acts evidence, he objects to portions of recorded statements that were ultimately not published to the jury. We do not consider these. As one example, the State played excerpts of Hannah's recorded interview with the sensitive crimes detective. The Record reflects the State started the recording at 2 minutes and 54 seconds, stopped it at 13 minutes and 0 seconds, restarted it at 15 minutes and 5 seconds, and stopped it at 19 minutes and 45 seconds. In his list, Feciskonin complains of a statement that he says occurred at "14:48-15:05." This statement was not played for the jury.

As another example, the State played excerpts of Hannah's recorded interview with the officer who responded to the September 2020 incident Feciskonin complains of statements that he says occurred at "11:55-14:00." However, the Record reflects that the State stopped this recording at 12 minutes and 12 seconds, which it stated "is the end of the relevant portions of that recording." We do not consider any statements made after 12 minutes and 12 seconds.

[7] Although we do not individually address each challenged statement or piece of evidence in this opinion, we have reviewed them all, and, except as discussed in this opinion, the challenged statements are not other-acts evidence.

¶61    However, in context, this testimony occurred during Hannah's discussion about the September 2020 incident—she had just testified that her back was against the door to prevent Feciskonin from confronting Matthew, Feciskonin spit in her face, and then he purportedly grabbed her breast:

> [Hannah]: ….  I hit him away and I said you do not have the right to touch me anymore.
>
> [State]: Why did you say that?
>
> [Hannah]: Because he often used force for sexual things.
>
> [State]: What happened next?

¶62    This statement is not other-acts evidence.  *See **Jensen***, 331 Wis. 2d 440, ¶81 (no frame-by-frame analysis).  At a minimum, it is panorama evidence that describes Hannah and Feciskonin's relationship.  *See **id.***, ¶85 (Panorama "evidence involved the relationship between the principal actors[.]").  It also explained the context for Hannah's action.  Going further, this statement could also be considered evidence of the charged conduct itself.  After all, based on the evidence introduced at trial, at the time Hannah told Feciskonin he no longer had the right to touch her because he "often used force for sexual things," both second-degree sexual assaults that he was on trial for had already occurred.

¶63    As for other evidence included on Feciskonin's list, with limited exception (and as will be discussed below), the evidence is panorama evidence, and again sometimes, in context, evidence of the charged conduct itself.  As more examples, Feciskonin complains that when Hannah was describing the May 2020 physical assault, she stated she got down to the ground because "I knew that was where I was going to end up[,]" that Feciskonin always did the same intimidating stance, that Feciskonin was "an alcoholic and he often would get violent while intoxicated," that she avoided Matthew because otherwise she "would face

retaliation later from my husband," and that she begged Matthew to stop talking to Feciskonin because she would be punished including being raped. Again, this evidence is panorama evidence that provides context and background to Hannah and Feciskonin's relationship and the circumstances under which the charged conduct occurred. *See id.*, ¶¶81, 85.

¶64 Similarly, Matthew's testimony that after Feciskonin learned of the affair, he heard fighting next door, that Hannah told him not to interact with Feciskonin because she was abused as a result of their interactions, that Feciskonin routinely threatened Matthew on a daily or bi-daily basis, that Hannah confided Feciskonin had been "forcing himself on [Hannah], [w]aking her up in the middle of the night doing it[, f]orcing her to give oral" was, in context, again not other-acts evidence. Rather, this evidence related directly to the charges or was panorama evidence describing the dynamics of the relationship at the time of the charged incidents. *See id.*

¶65 The same is true of Hannah's testimony that Feciskonin had previously broken the door after Hannah locked him out of the house, statements made in the September 911 call where Hannah told dispatch Feciskonin had previously broken in, and the responding officer's statement that Feciskonin had broken the door previously. This evidence related directly to the conduct Feciskonin was on trial for—the "new" damage to the door and explained why the door was damaged beyond what was alleged at trial.

¶66 Turning to the exhibits, Feciskonin complains that in the portions of Hannah's interviews that were played for the jury, Hannah made statements to police that suggested physical and sexual assaults happened all the time. Hannah advised police that the assaults would usually start if she was outside at the same

23

time as Matthew, that the tension would build up and he would assault her at night, that he would get aggressive and naked and expected sex from her, that he would try to force his penis in her mouth, that she would cry after each assault, that he assaulted her approximately ten times with three of those assaults involving forced penetration (but she then only described two assaults at trial). Feciskonin also objects to a message Hannah sent after the May 2020 physical assault where she called him a monster, complained about "how bad [he] beat [her]" and wrote, in part, "Not to mention how many times you raped or sexually forced me to please you." Feciskonin argues "[t]he trial involved only 2 counts of second-degree sexual assault making reference to any additional sexual assaults beyond 2, inadmissible other acts evidence."

¶67     We disagree. The challenged evidence is not other-acts evidence. This evidence was submitted to "completely describe" how Feciskonin treated Hannah after learning of her relationship with Matthew. *See **Dukes***, 303 Wis. 2d 208, ¶28. It involved the relationship between Feciskonin and Hannah and "traveled directly to the State's theory" that Feciskonin sought revenge for Hannah's betrayal. *See **Jensen***, 331 Wis. 2d 440, ¶85. Under the State's theory, Feciskonin's behavior was inextricably intertwined with the physical and sexual assaults, and was material evidence. *See **Dukes***, 303 Wis. 2d 208, ¶28. This is not other-acts evidence.

¶68     We next turn to Feciskonin's assertions that the State used improper other-acts evidence in its opening statement, closing argument, and during cross-examination. Specifically, in the State's opening statement and closing argument, Feciskonin complains about the statements that he had abused Hannah for more than one year, that he used the affair as an opportunity to "further break" her, that every time Feciskonin was angry about her infidelity, he demanded sex

24

with force and without consent, and Hannah would describe at trial two sexual assaults that stood out to her (which Feciskonin argues suggested there were more). Feciskonin contends all these statements referenced inadmissible other-acts evidence.

¶69 We disagree. None of the complained-of statements or arguments made during the State's opening statement or closing argument referenced impermissible other-acts evidence. The statements were proper argument and reflected comments on the charged offenses and gave context to Feciskonin and Hannah's relationship.

¶70 Feciskonin also complains the State inappropriately referred to other acts during its cross-examination of Feciskonin and his defense investigator. Specifically, Feciskonin complains that during cross-examination, after the investigator told the State he had no idea why Hannah would be suicidal, the State improperly referenced other-acts evidence when it asked the investigator whether he was familiar with the years of abuse Hannah endured from Feciskonin. Feciskonin also asserts the State inappropriately referenced other-acts evidence when it asked Feciskonin about whether he had previously been drunk and violent, and whether he previously beat Hannah such as when he found out about the affair in August 2019 and in March 2020 (the "beer-can incident"). Aside from the "beer-can incident," which we will discuss below, the State's questions did not improperly reference other-acts evidence. In his direct examination, Feciskonin specifically denied assaulting Hannah. The State's questions were proper cross-examination.

¶71 Because the evidence and challenged statements as discussed above were not other-acts evidence, counsel was not ineffective for failing to object on

this basis. *See **Dalton***, 383 Wis. 2d 147, ¶53 (counsel is not ineffective for not raising meritless objections).

### 2. Beer-can incident

¶72 We now turn to the "beer-can incident." During trial, the jury learned that in March 2020, Feciskonin hit Hannah in the face with a beer can, causing a black eye. This evidence was first partially introduced during Hannah's redirect testimony, after defense counsel had questioned Hannah about waiting until September 2020 to disclose the sexual assaults. In response, the State produced a message Hannah had sent to Matthew on March 16, 2020 that disclosed a sexual assault and was admitted into evidence and read to the jury. As stated previously, the message read:

> [T]hanks for being the reason I get beat tonight. I already got raped. He just wants more ammo. Don't even entertain it. My black eye just healed. My boss can confirm it if you don't believe me. Every time this topic comes up, he hurts me. Please for my safety or for my safety please don't talk to him about it.

¶73 At this point, we conclude the evidence was panorama evidence and evidence of charged conduct. The message was used in a limited fashion to prove Hannah had disclosed a sexual assault before September 2020, and the message continued to provide context and narration to the dynamics of Feciskonin and Hannah's relationship. *See **Dukes***, 303 Wis. 2d 208, ¶28; ***Jensen***, 331 Wis. 2d 440, ¶85. However, during the State's cross-examination of Feciskonin, the State's use of this incident changed.

¶74 Specifically, after Feciskonin denied physically assaulting Hannah, the State began using the beer-can incident and Hannah's black eye to prove

intent, motive, lack of mistake—at this point, the evidence became other-acts evidence. As stated previously, the following exchange occurred:

> Q. You didn't beat your wife in March of 2020 by hitting her in the face with a beer can and causing her to have a black eye?
>
> A. No.
>
> Q. You're aware she took pictures of her black eye after that incident?
>
> A. I remember that she did.
>
> Q. You remember that she took pictures of the black eye you had given her?
>
> A. I didn't give it to her.
>
> Q. Mr. Feciskonin, I am going to hand you first what has been marked as Exhibits 59, 60 and 61 and 62. You recognize those all to be photographs of your wife?
>
> A. I do.
>
> Q. Those appear to be selfies, pictures she took herself with her camera?
>
> A. Correct. This is what we are considering the black eye?
>
> Q. You see that in two separate sets of photographs th[is] one shows her with no make up and you can clearly see bruising around her eyes and the other is her face caked in make up as she tries to cover it up; right?
>
> A. I see that.
>
> Q. That was her attempt to cover up bruises that you had given her; right?
>
> A. Correct.

The jury also saw a photograph of a dented beer can.

¶75 The State again relied on this evidence during its rebuttal. There, a detective testified about the black-eye photographs and explained that Hannah had

27

indicated she received those injuries when Feciskonin punched her while holding a beer can.

¶76 During postconviction proceedings, the circuit court engaged in a *Sullivan* analysis and determined the beer-can incident was admissible other-acts evidence. The court reasoned the evidence was offered for an acceptable purpose (intent, motive, knowledge), the evidence was relevant to the charged conduct, and the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice, confusion, or delay.

¶77 We agree. Intent and motive are permissible purposes for the admission of other-acts evidence. *See* WIS. STAT. § 904.04(2). Further, the evidence was relevant and probative to prove Feciskonin's intent in committing the charged acts of substantial battery and strangulation. *See State v. Hurley*, 2015 WI 35, ¶¶76-79, 361 Wis. 2d 529, 861 N.W.2d 174. The evidence was also relevant to his motive to exert power and control over Hannah through domestic abuse, especially after her infidelity. *See State v. Dorsey*, 2018 WI 10, ¶¶48-49, 379 Wis. 2d 386, 906 N.W.2d 158 (prior acts of physical abuse were relevant to the defendant's motive to control the victim in present domestic violence case).

¶78 We also agree the probative value of the evidence was not substantially outweighed by the risk of unfair prejudice. Despite the photos and references regarding the beer can and black eye, the Record reflects the event was not described in gruesome detail. As the circuit court observed during postconviction proceedings, this incident was "rather bland in its description compared to the charged incidents[.]" We agree. That Hannah once accused Feciskonin of hitting her with a beer can and causing a black eye was not more prejudicial than the allegations that he chased her into a bathroom and forced his

28

penis into her mouth while she cried or that he beat her, splitting open the back of her head, and tried to throw her down the basement stairs while his daughter screamed in terror.

¶79    Because we conclude this incident was admissible other-acts evidence, we conclude counsel was not ineffective for failing to object to this evidence or the State's questions related to this evidence.  *See Dalton*, 383 Wis. 2d 147, ¶53 (counsel is not ineffective for not raising meritless objections).

### B.  Incarceration

¶80    Feciskonin next argues counsel was ineffective for failing to object to comments on his incarceration.  He identifies in his brief the occasions where these references occurred.  First, during Hannah's direct examination, when asked why she did not specifically seek out medical attention for the May 2020 strangulation, Hannah explained:

> [Feciskonin] was in custody.  I felt safe with him being in custody.  I didn't feel like I wanted to open another can of worms by calling the police again.  I also viewed it as very minor in comparison to my head laceration.  My focus was basically solely on my head laceration.

¶81    Later, when the State asked Hannah why she decided to report the sexual assaults in September 2020, Hannah explained, in part,

> There were a number of reasons … When I did report them, I knew he was in custody.  I should go back.  I should say I knew he was in custody when I did my interview with [the sensitive crimes detective].  There was a delay in him being arrested.

¶82    Then, on cross-examination, defense counsel questioned Hannah about why she waived the 72-hour no-contact provision after the May 2020 incident, and she stated it was because she felt reassured by police that Feciskonin

29

would be in custody for that time period. Defense counsel also elicited testimony from Hannah regarding the steps the couple had taken for divorce. Hannah agreed Feciskonin had picked up a joint-divorce filing packet from the courthouse "earlier in the summer of 2020," that he had filled out his portion, and that he had given it to her to complete her portion. The following exchange occurred:

> [Defense counsel]. You never finished filling out that paperwork; did you?
>
> [Hannah]. No. I intended to.
>
> [Defense counsel]. You didn't file anything with the Court either as far as the divorce; right?
>
> [Hannah]. No. Because he was incarcerated so I have to now file singly instead of jointly so I have new paperwork to do.

¶83 Finally, a police officer testified that following the incident on September 22, 2020, she was one of the officers who went to Feciskonin's workplace in order to take him into custody.

¶84 The circuit court determined the Record conclusively established counsel was not ineffective for failing to object to these incarceration references. It explained that nothing indicated Feciskonin was in custody at the time of trial. As for the references to the fact that Feciskonin was in custody immediately following the May 2020 and September 2020 incidents, the court determined:

> No one would be surprised under those circumstances that police would take that person into custody. That is just expected. Everything we see on TV and in the movies, everything we read in the papers, everything we see in the news tells us that is what happens. When serious battery has been alleged and there are obvious significant injuries, you are going into custody.

¶85    We agree with the circuit court.  Nothing suggested that Feciskonin was incarcerated at the time of trial.  That Feciskonin was arrested in May and September following Hannah's accusations does not create a reasonable probability that the result of the trial would have been different but for trial counsel's failure to object.  *See Strickland*, 466 U.S. at 694.  Counsel was not ineffective for failing to object to the references to Feciskonin's incarceration.

### C.  Curative jury instructions

¶86    Feciskonin next argues trial counsel was ineffective for failing to request curative jury instructions regarding the other-acts evidence or evidence of his incarceration.  As for the incarceration, during postconviction proceedings, trial counsel testified he did not ask for a curative jury instruction regarding Feciskonin's custodial status because:

> There were multiple witnesses and the amounts and times where things like that would have been highlighted or noted, I felt like everybody knew [an arrest] was part of the process but felt like it wasn't a major part of the process. And I again didn't want to highlight that issue if any [juror] members maybe missed it.

¶87    We conclude trial counsel was not deficient for failing to ask for a curative instruction on Feciskonin's incarceration.  *See Dalton*, 383 Wis. 2d 147, ¶34.  As outlined above, the testimony regarding Feciskonin's incarceration was minimal, the jury did not learn he was incarcerated at the time of trial, and it was reasonable for trial counsel to determine a curative instruction would improperly highlight the fact that Feciskonin was arrested based on Hannah's accusations. *See id.*, ¶35.  Counsel was not ineffective for failing to ask for a curative instruction on Feciskonin's custodial status.

31

¶88    Turning to a curative other-acts instruction, trial counsel stated that he did not consider asking for a curative instruction on the 2017 incident or the beer-can incident because he was trying to keep the jury focused on the defense trial strategy. He stated "[t]he theory that we were putting forward was [a] bad break up and a person who was ready, willing and able to, you know, create and show a narrative that benefited her." On appeal, Feciskonin argues trial counsel's explanation makes "no sense" because "even with that strategy, the defense would want the jury to know it could not use [other-acts] evidence inappropriately."

¶89    Assuming, without deciding, that Feciskonin's counsel performed deficiently by not asking for an other-acts curative instruction, we are not persuaded that the lack of such an instruction affected the verdicts. The primary danger of other-acts evidence is the potential that jurors will think the other-acts evidence shows that the defendant had a propensity to commit the type of crime charged. *See* WIS. STAT. § 904.04(2). Feciskonin does not persuade us that this danger is significant here. At a minimum, the acquittals on the strangulation and suffocation and fourth-degree sexual assault charges strongly suggest that the jury did not improperly hold the other-acts evidence against Feciskonin. *See State v. Prineas*, 2009 WI App 28, ¶36, 316 Wis. 2d 414, 766 N.W.2d 206 (ineffective assistance of counsel requires a showing of prejudice but defendant was acquitted on four of the six charges).

¶90    Further, of the charges for which the jury found Feciskonin guilty, the evidence was overwhelming. *See State v. Thiel*, 2003 WI 111, ¶61, 264 Wis. 2d 571, 665 N.W.2d 305 ("[I]n most cases errors, even unreasonable errors, will not have a cumulative impact sufficient to undermine confidence in the outcome of the trial, especially if the evidence against the defendant remains

32

compelling."). The circuit court observed the State's case was strong and "there was actually an awful lot of evidence that corroborated what came in."

¶91   Aside from Hannah's testimony, the circuit court observed that, in regard to the May 2020 incident, the jury learned that police were dispatched because Feciskonin's daughter's mother called them in response to what her daughter witnessed, Feciskonin would not let police see Hannah when they arrived, Matthew heard Hannah screaming for help during the incident, and the photos showed blood on the floor and on the basement stairway walls and a hole in the door from the Bluetooth speaker. As for the September 2020 incident, an officer testified he viewed surveillance of the outdoor portion of the incident, Matthew testified about the incident, there were photographs of the door, and the jury heard the contemporaneous 911 call. As for the second-degree sexual assaults, the jury saw Hannah's March message to Matthew that Feciskonin had raped her as well as Feciskonin's later text apologizing for having her perform oral sex on him while she was crying.

¶92   We conclude that under the totality of the circumstances Feciskonin received a fair trial, and our confidence in the result is not undermined. *See Strickland*, 466 U.S. at 694. Feciskonin has not established prejudice, and as such, counsel was not ineffective. *See Dalton*, 2018 WI 85, ¶32

### III.   Rape-shield evidence

¶93   Feciskonin next argues the circuit court erred by allowing testimony about Hannah's affair with Matthew into evidence. He asserts the evidence should have been excluded because Wisconsin's rape-shield statute prohibits any evidence of a complainant's sexual activity to be introduced at trial. *See* WIS. STAT. § 972.11(2). He also argues the error is not harmless.

¶94 During postconviction proceedings, the circuit court concluded the sexual component of Hannah's affair with Matthew was indeed inadmissible rape-shield evidence. However, the court concluded the evidence's admission was harmless. In support, the court explained that a sanitized version of Hannah and Matthew's relationship would have been admissible at trial. The State could have still put in testimony of Hannah and Matthew's friendship and that Feciskonin "was jealous and angry at [Matthew] because he and [Hannah] talked a lot." The court also found that any prejudice that came from the jury learning about the affair affected Hannah and Matthew and their credibility. The court reasoned that Feciskonin benefited from the admission of the sexual component of the affair because, without this evidence, the jury would have wondered why Feciskonin got "triggered so bad" by Hannah and Matthew's relationship.

¶95 We agree with the circuit court that only the sexual component of Hannah and Matthew's relationship was improperly admitted and a sanitized version would have been admissible at trial. We also agree that the admission of this evidence was harmless. *See State v. Mitchell*, 144 Wis. 2d 596, 619-20, 424 N.W.2d 698 (1988) (The erroneous admission of rape-shield evidence is subject to a harmless-error analysis). For an error to be harmless, the party benefitting from the error must demonstrate that it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *State v. Harvey*, 2002 WI 93, ¶49, 254 Wis. 2d 442, 647 N.W.2d 189 (citation omitted). Here, we are convinced that if the evidence of the sexual nature of Hannah and Matthew's relationship had been excluded from the trial, the jury would have still convicted Feciskonin.

34

### IV.    Exclusion of text-message exchanges

¶96    Feciskonin next argues the circuit court erred by denying his pretrial motion to admit six sexual text-message exchanges (labeled A-F) between Hannah and Feciskonin.  The court initially excluded the messages on the basis that the probative value of the evidence was undermined by the evidence's prejudicial effect.

¶97    During trial, the circuit court revisited its determination before Feciskonin presented his defense.  Ultimately, the court permitted Feciskonin's investigator to testify as to two of the text messages (motion items D and E; trial exhibits 54 and 55), and the investigator did during his testimony.

¶98    As to the remaining four text-message exchanges, at trial, the State made an offer of proof that two of the text exchanges (motion items A and C) were taken out of context.  The court stated:

> I am learning for the first time this morning that it appears that item A and item C are connected to each other in a close text chain … I had been assuming these were things that were completely different conversation[s].  But it appears now that they weren't.
>
>     …. [T]hey kind of had a back and forth.  So that puts A in a different context for me because it turns out it's not love and attraction from [Hannah] to [Feciskonin] in item A, it is sarcasm.

¶99    We conclude the circuit court properly determined the remaining four text-message exchanges were not admissible under WIS. STAT. § 904.03.  The messages were highly prejudicial and inflammatory, and their probative value (they were offered to establish that Hannah sometimes sent explicit texts expressing desires for consensual sex with Feciskonin) remained extremely low. At trial, Hannah readily admitted there were multiple incidents of consensual sex

during the charging period. The Record reflects the court did not erroneously exercise its discretion by excluding the text messages at trial. *See State v. Ringer*, 2010 WI 69, ¶24, 326 Wis. 2d 351, 785 N.W.2d 448 ("The admission of evidence is subject to the circuit court's discretion.").

## V. Plain error and interest of justice

¶100 Finally, Feciskonin argues that, based on the purported errors identified above, he is entitled to a new trial based on plain error or in the interest of justice. We disagree.

¶101 Plain error is an error so obvious, substantial, and fundamental that relief must be granted despite a lack of objection at the time. *State v. Jorgensen*, 2008 WI 60, ¶21, 310 Wis. 2d 138, 754 N.W.2d 77. We employ the doctrine of plain error sparingly, only when the defendant has been denied a basic constitutional right or the substantial impairment of a fair trial. *State v. Sonnenberg*, 117 Wis. 2d 159, 178, 344 N.W.2d 95 (1984). Based on our review of the Record and briefing, including our discussion of the purported errors identified above, we conclude that Feciskonin has failed to identify any errors that are so fundamental, obvious, and substantial to warrant the application of the plain-error doctrine here.

¶102 As for a new trial in the interest of justice, under WIS. STAT. § 752.35, we may order a new trial "if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried[.]" We have already rejected Feciskonin's other arguments. *See State v. Ferguson*, 2014 WI App 48, ¶33, 354 Wis. 2d 253, 847 N.W.2d 900 (denying interest-of-justice claims that rehash arguments that failed on other grounds). We also conclude Feciskonin has failed to establish that this is an

"exceptional case[ ]" warranting discretionary reversal. *See **State v. Schutte***, 2006 WI App 135, ¶62, 295 Wis. 2d 256, 720 N.W.2d 469 ("We exercise our authority to reverse in the interest of justice under § 752.35 sparingly and only in the most exceptional cases."). We therefore reject Feciskonin's argument that a new trial is warranted in the interest of justice.

  *By the Court.*—Judgments and orders affirmed.

  This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.